**MICHIGAN HEAD START DIRECTORS ASSOCIATION et al., Plaintiffs,**

v.

**Earl BUTZ, as Secretary of Agriculture et al., Defendants.**

**No. G74–207 C.A.**

United States District Court,
W. D. Michigan, S. D.

May 30, 1975.

Robertamarie Kiley, Lansing, Mich., for plaintiffs.

Frank S. Spies, U. S. Atty., Grand Rapids, Mich., for defendants.

## OPINION AND ORDER

FOX, Chief Judge.

This case raises the issue of whether the Secretary of Agriculture may exclude non-school Head Start programs [1] from participation in the eighty per cent of food operating cost reimbursement provisions of the Special Food Service Program [hereafter referred to as SFSP], National School Lunch Act, as amended,[2] Sec. 13, 42 U.S.C. Sec. 1761.[3] The Special Food Service Pro-

---

1. Head Start programs are organized under 42 U.S.C. Sec. 2809(a)(1).

2. 42 U.S.C. Sec. 1751 et seq.

3. Sec. 13 of the National School Lunch Act, as amended, 42 U.S.C. Sec. 1761, provides, in pertinent part:

§ 1761. Special food service program for children—Authorization of appropriations.

(a)(1) There is hereby authorized to be appropriated such sums as are necessary for each of the fiscal years ending June 30, 1973, June 30, 1974, and June 30, 1975, to enable the Secretary to formulate and carry out a program to assist States through grants-in-aid and other means, to initiate, maintain, or expand nonprofit food service programs for children in service institutions. For purposes of this section, the term "service institutions" means private, nonprofit institutions or public institutions, such as child day-care centers, settlement houses, or recreation centers, which provide day care, or other child care where children are not maintained in residence, for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers, and includes public and private nonprofit institutions providing day care services for handicapped children.

(2) Subject to all the provisions of this section, the term "service institutions" also includes public or private nonprofit institutions that develop special summer programs providing food service similar to that available to children under the National School Lunch or School Breakfast Programs during the school year, including such institutions providing day care services for handicapped children. To the maximum extent feasible, consistent with the purposes of this section, special summer programs shall utilize the existing food service facilities of public and nonprofit private schools.

gram was established in 1968 by Public Law 90–302, Sec. 3, 82 Stat. 117, and modified by, inter alia, Public Law 92–433, 86 Stat. 724, as set forth more fully below.

The plaintiffs are Tri-County Community Action, Inc., and Capitol Area Economic Opportunity Committee, Inc. (Head Start Division), both of which are non-profit organizations which operate Head Start programs.[4] The plaintiff Michigan Head Start Directors Association is a Michigan non-profit corporation composed of the Directors of the various Head Start programs throughout the State of Michigan.

Each of the defendants is an official of the United States Department of Agriculture [hereafter referred to as USDA] having some responsibility for the administration of SFSP. Earl Butz is the Secretary of Agriculture. Edward J. Hekman is the Administrator of the USDA's Food and Nutrition Service. His duties include the supervision of the SFSP. Dennis M. Doyle is Administrator of Midwest Regional Office of the USDA's Food and Nutrition Service. Michigan is within the jurisdiction of the Midwest Regional Office. Doyle's duties include the supervision of the SFSP in the region. R. J. Nelson is Director of the Child Nutrition Programs of the USDA's Food and Nutrition Service, Midwest Regional Office. He has re-

sponsibility for the operation of SFSP in the region.

The parties have filed extensive stipulations of fact. Although the defendants have never filed a written answer they have filed a motion to dismiss or in the alternative for summary judgment. The plaintiffs have filed a cross-motion for summary judgment. This opinion and separate order are based on the pleadings, affidavits, exhibits, stipulations, and other papers on file in the case.

I.

A brief review of the context in which this case arises will be helpful before the court turns to the jurisdictional and substantive issues.

In the middle and late 1960's, Congress was becoming increasingly concerned about the high incidence of hunger and malnutrition among American children. Among other actions, Congress passed the Child Nutrition Act of 1966, Pub. L. 89–642, 80 Stat. 885, 42 U.S.C. Sec. 1771 et seq., which established a school breakfast program, 42 U.S.C. Sec. 1773, to supplement the older school lunch program. The Child Nutrition Act empowered the Secretary of Agriculture to authorize financial assistance of up to eighty per cent of an individual school's costs of operating the breakfast program in circumstances of severe need where

---

. . .

(c)(1) Funds paid to any State under this section shall be disbursed by the State educational agency to service institutions, selected on a nondiscriminatory basis by the State educational agency, (A) to reimburse the service institutions for the cost of obtaining agricultural commodities and other foods, and (B) for the purposes of paragraphs (2) and (3) of this subsection. The costs of obtaining agricultural commodities and other foods may include the cost of the processing, distributing, transporting, or handling thereof. Disbursement to participating service institutions shall be made at such rate of reimbursement per meal as the Secretary shall prescribe.

(2) In circumstances of severe need where the rate per meal established by the Secre-

tary is insufficient to carry on an effective feeding program, the Secretary may authorize financial assistance not to exceed 80 per centum of the operating costs of such a program, including the cost of obtaining, preparing, and serving food. Non-Federal contributions may be in cash or kind, fairly evaluated, including but not limited to equipment and services. In the selection of institutions to receive assistance under this subsection, the State educational agency shall require the applicant institutions to provide justification of the need for such assistance.

4. Other organizations listed as plaintiffs in Stip. No. 6 were not formally added to this suit.

the ordinary per meal rate of government financing was deemed by the Secretary to be insufficient to carry on an effective breakfast program.[5]

Congress very quickly realized that providing breakfasts and lunches to school children was not sufficient to meet the total problem. Preschool children were not reached at all and most school-age children were not reached during the summer months. The House Committee on Education and Labor reported out H.R. 15398 which was designed to fill the gap by establishing the SFSP and which, as amended, became Public Law 90–302.[6]

Apart from equipment, which is treated separately, SFSP has two levels of funding for participating service institutions. The lower level is a per-meal reimbursement rate, established by the USDA, intended to cover at least the cost of purchasing food, 42 U.S.C. Sec. 1761(c)(1).[7] The higher level is an amount up to 80 per cent of the food operating cost, including the cost of obtaining, preparing, and serving food, 42 U.S.C. Sec. 1761(c)(2).[8] Since service institutions can receive 80 per cent of food operating cost reimbursement only "in circumstances of severe need where the rate per meal established by the Secretary is insufficient to carry on an effective feeding program," 42 U.S.C. Sec. 1761(c)(2), USDA has established eligibility criteria for those not categorically excluded. In approving service in-

stitutions for operating cost funding, the administrators take into consideration all sources of funds of the applicant institution, including funds from other federal sources. Stip. No. 18.

As appears more fully below, non-school Head Start programs are now eligible to receive reimbursement at the lower per meal rate under SFSP, but are categorically ineligible for the higher level of assistance.

Public Law 90–302 authorized $32,-000,000 to be appropriated for fiscal years 1969, 1970 and 1971 to carry out the SFSP. It appeared however, that the authorized sum was inadequate to fulfill the aims of the program. In 1972, Congress enacted an open-ended authorization for fiscal years 1973, 1974 and 1975. Pub.L. 92–433, Sec. 2(a), 86 Stat. 724.[9]

The Special Food Service Program under 42 U.S.C. Sec. 1761 is administered by the United States Department of Agriculture. Within the USDA, the Food and Nutrition Service and its Regional Offices have primary responsibilities. In 32 states, the program is administered by, and the funds are disbursed by, state educational agencies under regulations and instructions issued by the USDA. In Michigan, the program is administered by the Michigan Department of Education under a contract and binding guidelines and instructions issued by USDA. Stip. No. 11.

---

5. Pub.L. 89–642, Sec. 4(d), 80 Stat. 886. Sec. 4(d) provided:

> (d) In circumstances of severe need where the rate per meal established by the Secretary is deemed by him insufficient to carry on an effective breakfast program in a school, the Secretary may authorize financial assistance up to 80 per centum of the operating costs of such a program, including cost of obtaining, preparing, and serving food. In the selection of schools to receive assistance under this section, the State educational agency shall require applicant schools to provide justification of the need for such assistance.

In 1971, this section was amended to provide for up to 100 per cent reimbursement for food

operating costs. Pub.L. 92–32, Sec. 4, 85 Stat. 85.

6. House Report No. 1114 accompanying H.R. 15398 explained the situation in 1968 and the purposes of the Special Food Service Program which the bill would establish. Excerpts from the Report are reproduced as Appendix A.

7. Quoted supra note 3.

8. Quoted supra note 3.

9. For appropriations and expenditures by fiscal year, see Stip. No. 12. Appropriations exceeded expenditures in all years but one between fiscal 1969 and fiscal 1974.

This suit concerns the relationship of Head Start projects to the Special Food Service Program. Head Start projects are under the jurisdiction of and are funded by the Office of Child Development [hereafter referred to as OCD] in the Office of Human Development in the Department of Health, Education and Welfare [hereafter referred to as HEW]. Stip. No. 7. One among many of the purposes of Project Head Start is to provide preschool children from low income families with certain "comprehensive . . . nutritional . . services . . . ," 42 U.S.C. Sec. 2809 (a)(1). Head Start projects are required, as a condition of OCD funding, to provide nutritional services, including a food service which meets OCD's standards. Stip. No. 24. At present, Head Start projects make no charge for meals served to children. Stip. No. 25. See also, Stip. No. 23.

It is undisputed that all Head Start projects are "service institutions" within the meaning of the statute establishing the Special Food Service Program, 42 U.S.C. Sec. 1761(a)(1). Head Start projects are, at an absolute minimum, not statutorily precluded from participating in SFSP. The problem in this case arises in part because of the curious division of administrative duties by Congress. The Secretary of Agriculture is assigned operational responsibilities with regard to SFSP, including Head Start projects, while HEW and OCD have general operational authority over Head Start projects in other respects, including the nutritional services.

HEW and OCD have no established funding differentiation between Head Start projects administered by schools and those administered by non-school agencies. Stip. No. 8. Nevertheless, for the purposes of determining the level of funding under SFSP, it has come to make a difference whether an individual Head Start program is administered by a school or not. If a school operates a Head Start program, if the school is the grantee or delegate agency, and if the school is participating in either the National School Lunch or the Breakfast program, or both, then the Head Start program is administratively defined as a "school," 7 C.F.R. Secs. 210.2(o), 220.2(q), and is eligible to participate with the school in one or both programs, as the case may be. Stip. No. 9. In these circumstances, the school Head Start project does not need to participate in the separate Special Food Service Program.

If a Head Start program is not connected with a grantee or delegate participating school, then the eligibility requirements for participation in SFSP may be different. In November 1969, USDA and the Office of Economic Opportunity [the agency then administering Head Start projects] decided to exclude all Head Start projects not already participating from any participation in the SFSP. Since only about five per cent of the existing Head Start projects were then participating in SFSP, ninety-five percent of the non-school projects became categorically ineligible. There have been almost no new Head Start programs begun since 1969. Stip. No. 10.

In October 1973, a suit was filed in the United States District Court for the District of Columbia, challenging USDA's refusal to allow non-school Head Start projects to participate in the SFSP. Community Education Extention of Mary Holmes College, et al. v. Butz (D.D.C.No.CA—1655–73). Later that month, USDA formally rescinded the instruction which denied participation in the SFSP to non-school Head Start Projects. However, USDA allows these projects to participate only on a per-meal reimbursement basis, the lower of the two possible levels of funding under the SFSP. Stip. No. 13.

As of June 1974, 994 non-school Head Start projects were participating in SFSP. In Michigan, 15 non-school Head Start projects enrolling approximately 4,400 children were participating in SFSP as of June 1974. Stip. No. 17. All

of these were receiving a per-meal reimbursement, and none was receiving reimbursement for 80% of food operating costs.

The plaintiffs brought this case to challenge the USDA's categorical exclusion of non-school Head Start projects from the higher 80% of food operating cost reimbursement provisions of SFSP, 42 U.S.C. Sec. 1761(c)(2).

Under present instructions of OCD, Head Start budgets must be adjusted to reflect to reprogramming of funds replaced by reimbursement from SFSP. The first priority for reprogramming is upgrading the quality of the nutrition program. If such program is sufficient, funds are then allocated to the areas of greatest need within the Head Start projects program. Stip. No. 22. Thus, if this court grants the requested relief, if individual Head Start projects establish that they are in circumstances of severe need, and if other factors remain constant, then at least the nutritional aspects of Head Start projects would be improved.

## II.

■■ Before discussing the merits, the court must resolve issues relating to the identity of the parties and the jurisdiction of the court. Some of the jurisdictional issues relate to the question of whether the court has the authority to grant the requested remedy, and this question implicates the merits. This court has jurisdiction to determine its own jurisdiction, and power to construe the statutes involved to determine whether the Secretary of Agriculture exceeded his statutory powers. Harmon v. Brucker, 355 U.S. 579, 582, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). The following discussion of the jurisdictional questions anticipates and occasionally incorporates conclusions concerning the merits reached in Part III of this Opinion, infra.

### A. STANDING.

■ The plaintiffs Tri-County Community Action, Inc., and the Capitol Area Economic Opportunity Committee, Inc., having standing as organizations which operate Head Start programs to maintain this suit. The allegation that they are not receiving all the funds to which they are entitled because of their categorical exclusion from applying for Sec. 1761(c)(2) SFSP funds is certainly an allegation of injury in fact. Since Head Start projects are "service institutions" within the meaning of the statute establishing the SFSP, 42 U.S.C. Sec. 1761, the plaintiffs are within the zone of interests to be protected or regulated by the statutes in question. See Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The Michigan Head Start Directors Association may join in the suit as a party plaintiff, F.R.Civ.P. 20(a).

### B. CLASS ACTION.

The plaintiffs bring this suit on behalf of themselves and all others similarly situated, including, in the words of the Complaint, "(a) all Head Start programs which have applied for participation in the 80 per cent reimbursement provisions of the Act and (b) all other Head Start programs which desire or intent [sic.] to participate in such reimbursement provisions but have been instructed by the government that they are not eligible to participate in the 80 per cent reimbursement provisions." The request that this suit be maintained as a class action has not been strenuously opposed by the defendants.

■ In light of the SFSP's definition of "service institution," the court concludes that a "program" can be a member of a class within the meaning of Rule 23, and that Tri-County Community Action, Inc., and Capitol Area Economic Opportunity Committee, Inc., are proper representative parties. The court finds that the class is so numerous that joinder of all members is impracticable, there are questions of law common to the class, the claims of the named plaintiffs are typical of the claims of the class, and the representative par-

ties will fairly and adequately protect the interests of the class, as defined below. F.R.Civ.P. 23(a). The court also finds that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate with respect to the class as a whole. F.R.Civ.P. 23(b)(2). This suit therefore may be maintained as a class action.

The class is finally defined to include all Head Start projects in Michigan which are "service institutions" within the meaning of Sec. 13 of the National School Lunch Act, as amended, 42 U.S.C. Sec. 1761; which are not currently eligible to participate in the School Lunch or Breakfast Programs; and which are not currently eligible to apply for or receive reimbursement for 80 per cent of their food service operating costs under the Special Food Service Program, Sec. 13(c)(2) of the National School Lunch Act, as amended, 42 U.S.C. Sec. 1761(c)(2), because of the categorical exclusion of such Head Start projects from eligibility to apply for such reimbursement by the Secretary of the United States Department of Agriculture. Because of the complexity of this case and because of the lack of uniformity among the circuits on the jurisdictional and quasi-jurisdictional questions which are raised, the court is unwilling to extend the definition of the class beyond Michigan.

### C. SOVEREIGN IMMUNITY.

The defendants contend that this suit is against the sovereign and therefore barred. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1948); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); see also, Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), and Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). The threshold question is whether the doctrine of sovereign immunity applies at all.

■■ The doctrine of sovereign immunity holds that a suit is jurisdictionally barred if, although nominally against an officer of the government, it is "in substance" a suit against the sovereign. Larson, supra, 337 U.S. at 688, 69 S.Ct. 1457. This doctrine defies comprehensive understanding. See Jaffe, "Suits Against Governments and Officers: Sovereign Immunity," 77 Harv.L.Rev. 1 (1963); Cramton, "Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant," 68 Mich.L.Rev. 389 (1970). "Sovereign immunity" is usually invoked by the executive in cases touching governmental proprietary and fiscal, as opposed to regulatory, functions. Apart from loose proprietary and fiscal categories, determining whether a suit is "in substance" against the sovereign is conceptually awkward where the true sovereign is "We the People," where all government is limited by at least one written constitution, and where the national government is divided into three branches, legislative, executive, and judicial. Although the doctrine of sovereign immunity is invoked by the executive branch to bar suits by private parties challenging executive action or inaction, it certainly cannot be said that the President or the executive branch alone is "sovereign." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700, 711 (1973); cf., United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

■■ Although held to be jurisdictional in nature, the modern doctrine of sovereign immunity is perhaps more properly viewed as a flexible judge-created doctrine of judicial restraint, cf., United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring), a function of the separation of powers and a re-

striction on the extent to which the judiciary may "check" or "balance" the executive branch at the request of private citizens. Since the legislative and executive branches are limited by the Constitution, and since it is the province and duty of the courts to define the Constitution and apply it to specific cases, Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); United States v. Nixon, supra, the doctrine of sovereign immunity rarely applies when plaintiffs challenge official action which is itself unconstitutional or is taken pursuant to an unconstitutional statutory grant. Dugan, supra, 372 U.S. at 621–622, 83 S.Ct. 999, but see Larson, supra, 337 U.S. at 691 n. 11, 69 S.Ct. 1457. The courts "check" the action of the legislature and executive in order to give full effect to the Constitution.

■ Where plaintiffs challenge administrative action taken under an admittedly constitutional statute on the grounds that the action violates the Congressional grant of authority, considerations of both separation of powers and checks and balances come into play, with the result that a principled application of "sovereign immunity" may become extremely difficult. The touchstone of sovereign immunity is found at the intersection between the intent of Congress in enacting a particular measure and larger considerations of the judiciary's role in a tripartite governmental system. In general, executive action which is clearly consistent with the intent of Congress will be held to be action of the "sovereign" and will not be further examined by the judiciary in the absence of a substantial allegation of unconstitutionality.

■ There are several specific types of cases involving facially constitutional statutes in which the doctrine of sovereign immunity may apply. Perhaps the clearest are those in which Congress has expressly prohibited judicial review or has expressly committed the matter in question to agency discretion. In such cases, constitutional agency action will be held to be ratified by Congress, and, because of the confluence of executive action and legislative intent, will be deemed to be the action of the "sovereign" with which the judiciary will not interfere.

■ Where judicial review is not clearly precluded by Congress, the problem is slightly different. If an executive action under a statute is clearly consistent with the intent of Congress, as unmistakably inferable from a reading of the statute, then, again, the action will be deemed to be that of the "sovereign," and the courts will not grant the requested relief. If the judiciary did interfere in such a case, it would be establishing itself as an alternative executive branch and would be substituting its judgment for that of both the executive and legislative branches.

The most difficult case is the one involving the ambiguous statute, where Congress neither expressly granted nor precluded judicial review, nor clearly and fully committed the matter in question to agency discretion, and where the intent of Congress on substantive matters was not made clear on the face of the statute. If the courts, after superficial examination, routinely refused all remedy in such cases, then the executive branch would become the true sovereign in these situations, with effective power to ignore the clear intent of Congress as expressed in committee reports and floor debates, although imperfectly expressed on the face of the statute. At least where the issue concerned the withholding of benefits granted by Act of Congress, the President would, because of the default of the judiciary, have an effective power to suspend legislation indefinitely, a power repugnant to the scheme of the Constitution, Kendall v. United States, 37 U.S. (11 Peters) 524, 9 L.Ed. 1181 (1838);[10] cf., Train v. City of New York, 420 U.S. 35, 95 S.Ct. 839,

10. In Kendall, a new postmaster general withdrew allowances, credits, and payments granted by his predecessor under contracts with the plaintiffs. The plaintiffs appealed to Con-

43 L.Ed.2d 1 (1975), a power not enjoyed by the English monarch since the Glorious Revolution of 1688. Groups which successfully appealed "within the system" to Congress would find their success a hollow accomplishment indeed. To routinely refuse all remedy in such cases would not preserve the separation of power so much as restrict the effective power of Congress to those matters on which it had spoken statutorily with utmost clarity.

Because of its concern to preserve a constitutionally proper allocation of power between Congress and the executive, and in recognition of the continuing "disfavor of the doctrine of governmental immunity from suit," Federal Housing Administration v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940), the modern Supreme Court has generally favored judicial review where statutes are somewhat ambiguous. Thus, "judicial review of final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress," Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), and agency action will be found to be committed to agency discretion by law, thus foreclosing judicial review, only "where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). Correlatively, courts have the power to reach the question of whether particular executive action is within the contemplation of relevant statutes. As the Supreme Court has said, "Admin-istrative determinations must have a basis in law and must be within the granted authority. . . . An agency may not finally decide the limits of its statutory power. That is a judicial function." Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); see also, Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); State Highway Commission of Missouri v. Volpe, 479 F.2d 1009 (8th Cir. 1973); Harmon v. Brucker, supra. The United States Court of Appeals for the District of Columbia recently observed, "An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with the Constitution and with the mandates of Congress which define and limit the authority of the executive. Any claim to executive absolutism cannot override the duty of the court to assure that an official has not exceeded his charter or flouted the legislative will." Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 788, 793 (1971); see also, National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971). Where, on inquiry, it appears that the officer has exceeded the statutory scope of his authority, the doctrine of sovereign immunity does not apply, and a grant of appropriate relief is ordinarily not barred. Dugan, supra, 372 U.S. at 621–622, 83 S.Ct. 999.

Still, there remains in the background the fear, based partly upon historical experience between 1890 and 1937, of "government by judiciary." This is the

---

gress, which passed a special act for their relief, but the postmaster failed to grant them all the relief required by the Act. The plaintiffs petitioned the court for a writ of mandamus. In upholding the grant of the writ, the Supreme Court said, "It was urged at the bar, that the postmaster general was alone subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law; and this right of the President is claimed, as growing out of the obligation imposed upon him by the constitution, to take care that the laws be faithfuly executed. This is a doctrine that cannot receive the sanction of this court. *It would be vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice.*" 37 U.S. (11 Peters) at 612–13 (emphasis added).

fear that the judiciary, on the suit of private parties, and on no real warrant of statutory or constitutional authority, will substitute its judgment for *both* the legislative and executive branches. Thus the Supreme Court has said that a federal court has no jurisdiction to hear a mere "claim of error in the exercise of [Congressionally delegated] power." Larson, supra, 337 U.S. at 690, 69 S.Ct. at 1461.

The instant case raises the question of whether the Secretary of Agriculture's categorical exclusion of non-school Head Start programs from participation in the 80 per cent of food operating cost reimbursement provisions of the SFSP, 42 U.S.C. Sec. 1761 (c)(2), is permitted by statute. In light of the admitted inclusion of Head Start programs as "service institutions" within the scope of Sec. 1761, and in light of Congress's direction that "severe need" be determined on an individual program-by-program basis, the plaintiffs argue that such a categorical exclusion is not even inferentially permitted by statute and is therefore an arbitrary and capricious exclusion of them from applying for benefits to which they believe they are entitled. Although the Secretary was given some discretion to administer the SFSP, the plaintiffs allege that the categorical exclusion in question exceeded that discretion. In this respect, the present case is indistinguishable from State Highway Commission of Missouri,

supra, where the issue was the scope of the Transportation Secretary's discretion, and where review was allowed and relief granted. This case thus falls squarely within the established "scope of authority" exception to the sovereign immunity bar. Dugan, supra. Moreover, the court can find no Congressional intent, explicit or implicit, to preclude the courts from reviewing alleged departures from the binding substantive requirements of the applicable statutes.

■ There is another aspect of the doctrine of sovereign immunity which requires investigation. Courts may refuse to entertain suits involving certain types of subject matter, such as governmental property, or requesting certain types of relief, even though such suits fall into one of the recognized exceptions to the sovereign immunity bar. Larson, supra, 337 U.S. at 691 n. 11, 69 S.Ct. 1457;[11] Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969), cert. denied 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed. 2d 115 (1970); Ogletree v. McNamara, 449 F.2d 93 (6th Cir. 1971); Place v. Weinberger, 497 F.2d 412 (6th Cir. 1974), cert. denied, 419 U.S. 1040, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). This aspect of the doctrine treats sovereign immunity not as a threshold jurisdictional bar, but merely as a bar to the grant of certain types of relief even where it otherwise appears that the plaintiff is entitled to relief on the merits.[12] Cf., Marbury v. Madison,

11. But compare, Dugan, supra, where the Court stated unequivocally that the sovereign immunity bar did not apply at all to action by officers beyond the scope of their statutory authority or to action which, although within the scope of their authority, was in itself unconstitutional or taken pursuant to an unconstitutional statute, 372 U.S. at 621–22, 83 S.Ct. 999. It is difficult to reconcile the dictum in Larson with the scheme of analysis followed in Dugan.

12. Sovereign immunity has historically been treated as a bar to the issuance of a remedy. The Larson case came before the Supreme Court on appeal from the District Court's grant of a motion to dismiss, which the Court of Appeals had reversed. The Supreme Court

purported to lay down threshold rules of pleading, 337 U.S. at 689–90, 69 S.Ct. 1457, while recognizing that "the jurisdiction of the court to hear the case may depend . . . upon the decision it ultimately reaches on the merits . . . ," id. at 690, 69 S.Ct. at 1461. A decision on the merits that an officer has acted constitutionally or within the scope of his statutory authority is thus also a decision on the jurisdictional question. Since state courts apparently cannot issue mandatory relief against federal officers, McClung v. Silliman, 19 U.S. (6 Wheat.) 598, 5 L.Ed. 340 (1821); Ex parte Tarble, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1871), the only utility of calling a decision on the merits "jurisdictional" seems to be to express and preserve the rule that the sovereign immuni-

supra, where the Supreme Court canvassed the merits first, and then determined that it had no jurisdiction to grant the requested relief.

■ The defendants contend that this suit is barred because the requested judgment, if given, would "expend itself on the public treasury," Dugan, supra, 372 U.S. at 621, 83 S.Ct. at 1007, or "restrain the Government from acting, or . . . compel it to act," Larson, supra, 337 U.S. at 704, 69 S.Ct. at 1468. However, the rule is that where a federal court finds that a statute gives a person a right to payment from the federal treasury, the court may order such payment notwithstanding the prior and contrary decisions of administrative officials. Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934).[13] Moreover, the plaintiffs have requested only an end to their categorical exclusion from eligibility for Sec. 1761(c)(2) reimbursement; they are not seeking a direct order for the payments of money.[14] In this respect, the present case is analogous to Train v. City of New York, supra, which was not barred. In addition, far from seeking to stop the government in its tracks, see Dugan, supra; Ogletree, supra, or to compel it to act in an area committed to agency discretion, Place, supra; Bramblett v. Desobry, 490 F.2d 405 (6th Cir. 1974), cert. denied 419 U.S. 872, 95 S.Ct. 133, 42 L.Ed.2d 111 (1974), the plaintiffs only request this court to require the executive to implement the mandate of Congress. Finally, this suit does not involve specific property, real or personal, in the possession of the United States, and this is not a suit for "the prevention or discontinuance, in rem," of an alleged wrong. Larson, supra, 337 U.S. at 688, 69 S.Ct. 1457; see Malone v. Bowdoin, supra; Hawaii v. Gordon, supra; Sierra Club v. Hickel, 467 F.2d 1048 (6th Cir. 1972), cert. denied 411 U.S. 920, 93 S.Ct. 1545, 36 L.Ed.2d 313 (1973).

■ The court thus concludes that the doctrine of sovereign immunity does not apply in this case, and the suit is not barred. See Kelley v. Metropolitan County Board of Education, 372 F.Supp. 528 (M.D.Tenn.1973); Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971).

### D. POLITICAL QUESTION.

■ ■ The defendants contend, although not strenuously, that this case involves a non-justiciable "political question." However, "political question" is a rather narrow term of art. A case containing a controversial issue, or one on which the legislative and executive branches may differ, does not automatically become non-justiciable. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); cf., Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The major issue in this case is statutory construction, and this court has jurisdiction to interpret relevant statutes, Harmon v. Brucker, supra; State Highway Commission of Missouri, supra, 479 F.2d at

ty defense may be raised at any time. See, e. g., State Highway Commission of Missouri, supra, where the defense of sovereign immunity was raised for the first time on appeal in a footnote to the government's petition for a rehearing, and was never fully addressed by either party. 479 F.2d at 1123. The "jurisdiction" label complements, but is not necessary to, the rule that sovereign immunity cannot be waived by executive officers. Case v. Terrell, 78 U.S. (11 Wall.) 199, 20 L.Ed. 134 (1870); Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939). Otherwise, equating a decision on the merits with a decision on jurisdiction only creates doctrinal confusion and encourages hasty dismissals on "jurisdictional" grounds.

13. Cf., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), where the Supreme Court accepted the proposition that a federal court's prospective injunctive order for the payment of welfare benefits was not barred by the principle of sovereign immunity as adopted by the Eleventh Amendment.

14. The defendants concede that "the mere right to apply, or application, for eighty per cent . . . funding will not entitle any Headstart project to such funding. They must justify the need for funding." Def. Memorandum of Points, at 9. See also, Def. Supplementary Brief, at 3.

1106–07. The question is whether the executive has complied with the statutory standards of administration laid down by Congress. This is not a nonjusticiable political question.

## E. SUBJECT MATTER JURISDICTION.

The plaintiffs allege jurisdiction under 28 U.S.C. Sec. 2201, 2202 (Federal Declaratory Judgment Act); 5 U.S.C. Sec. 701 et seq. (Administrative Procedure Act [hereafter referred to as APA]); 28 U.S.C. Sec. 1331 (Federal Question); and 28 U.S.C. Sec. 1361 (Mandamus).

■■ The Federal Declaratory Judgment Act is not an independent grant of jurisdiction to the district courts. However, since this court does find mandamus jurisdiction, infra, it has pendant jurisdiction to grant a declaratory judgment.

■■ In the Sixth Circuit, at least, the Administrative Procedure Act is not jurisdictional. Bramblett v. Desobry, supra, 490 F.2d at 407; cf., Sierra Club v. Hickel, supra, 467 F.2d at 1054. The court therefore does not have jurisdiction over this case by virtue of the APA alone.

■■ In order for this court to have jurisdiction under the federal question statute, 28 U.S.C. Sec. 1331, the amount in controversy must exceed $10,000. It is settled that in a class action each member of the class over which the court asserts jurisdiction must meet the jurisdictional amount requirement. Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). The plaintiffs have alleged that the amount in controversy exceeds $10,-000. However, this allegation has been challenged by the defendants. There is insufficient evidence in the record to enable the court to decide whether the jurisdictional amount is in fact met. Since the court determines that it does have jurisdiction under the mandamus statute, which has no jurisdictional amount requirement, the court need not require further evidence on this issue.

The Mandamus and Venue Act of 1962, Pub.L. 87–748, 76 Stat. 744, 28 U.S.C. Sec. 1361, grants this court "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." This case is properly brought against federal officers. Whether these officers owe a duty to the plaintiffs as alleged depends upon the merits, discussed infra. The court concludes that such a duty is owed.

Whether this is an "action in the nature of mandamus" is a question of some difficulty. The writ of mandamus has been abolished, F.R.Civ.P. 81(b), but some of the old technicalities incident to the writ of mandamus perhaps survive in the statutory "action in the nature of mandamus." The Mandamus and Venue Act of 1962 was enacted by Congress to give all federal district courts jurisdiction and venue over actions in the nature of mandamus with the District of Columbia court. See Byse and Fiocca, "Section 1361 of the Mandamus and Venue Act of 1962 and 'Nonstatutory' Judicial Review of Federal Administrative Action," 81 Harv.L.Rev. 308, 310–18 (1967). The principal problem has been in determining whether Congress intended to adopt the ministerial-discretionary distinction incident to the old writ or a functional analogue thereof as a jurisdictional limit on the new "action in the nature of mandamus."

■■■ The traditional ministerial-discretionary distinction in mandamus cases is a product of many of the same considerations of separation of powers and checks and balances which inform the doctrine of sovereign immunity. And the ministerial-discretionary distinction, like the doctrine of sovereign immunity, defies comprehensive understanding. It is said that for a case to involve a ministerial duty which the executive may be compelled by a court

to perform, the "duty" must depend "upon a statute or statutes the construction or application of which is not free from doubt," Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 219, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930); see also, United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 75 L.Ed. 1148 (1931) (duty must be "clear and indisputable"). Yet every executive officer acting, or failing to act, under a statute must construe that statute in order to ascertain the legislative standards of administration. A mandamus does not become unavailable just because a statute must be construed. Roberts v. United States, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (1900). And in reviewing administrative action or inaction federal courts must often engage in elaborate inquiries into the proper construction of the statute. Is it really meaningful to say that statutes are "free from doubt" where the administrative officer refuses to pay money allegedly due under the relevant statutes, and where, on complaint, the trial court orders the money paid, the Court of Appeals reverses, and the Supreme Court, after an extensive exercise in statutory construction, in turn reverses the Court of Appeals? Miguel v. McCarl, supra. The ministerial-discretionary distinction plainly does not rest upon independent and intelligible conceptual foundations. Like the doctrine of sovereign immunity, the ministerial-discretionary distinction is a flexible doctrine of judicial restraint.

The problem is to locate or formulate principled standards for granting or limiting review.

The Mandamus and Venue Act of 1962 was enacted after the Administrative Procedure Act, 5 U.S.C. Sec. 501 et seq., and the two acts plainly must be viewed as complementary, at least in cases to which the APA applies. The Mandamus and Venue Act is a jurisdictional counterpart of the "Form and venue of proceeding" section of the APA, 5 U.S.C. Sec. 703,[15] in cases to which the APA applies.[16] It follows that Congress, in rejecting the strict ministerial-discretionary distinction in the Mandamus and Venue Act,[17] see Byse and Fiocca, supra, 81 Harv.L.Rev. at 317, intended to adopt the same limits on the "action in the nature of mandamus" as exist on the application of the judicial review provisions of the APA, 5 U.S.C. Sec. 701(a), at least in cases to which the APA applies. Section 701(a) withholds judicial review "to the extent that —(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." In rejecting the traditional ministerial-discretionary distinction, the Congress wisely jettisoned the heavy freight of technicalities which unduly burden the old mandamus action. In implicitly adopting the APA standard, the Congress gave the courts a realistic standard which accomplishes the general purposes of rationally limiting judicial review in its modern legal and institutional setting.[18]

15. 5 U.S.C. Sec. 703 provides in part that in the absence or inadequacy of a special statutory provision, the form of proceeding for judicial review shall be "any applicable form of legal action, *including actions* for declaratory judgments or *writs of prohibitory or mandatory injunction* or habeas corpus *in a court of competent jurisdiction.*" (Emphasis added.) An action for a mandatory injunction is plainly an "action in the nature of mandamus." Cf., Miguel v. McCarl, supra, 291 U.S. at 452, 54 S.Ct. 465; Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). Of course, neither Miguel nor Panama Canal Co. concerned the Mandamus and Venue Act.

16. There may be suits maintainable as actions in the nature of mandamus to which the APA does not apply.

17. The proposition that Congress intended to reject the traditional ministerial-discretionary distinction for actions in the nature of mandamus has been accepted by many courts, and may now be taken as established, at least in the Sixth Circuit. See, e. g., Schatten v. United States, 419 F.2d 187 (6th Cir. 1969); Antonuk v. United States, 445 F.2d 592 (6th Cir. 1971); Kelley v. Metropolitan County Board of Education, supra.

18. In circuits such as the Sixth where the APA is not jurisdictional, this construction of the mandamus statute allows judicial re-

■ The court also concludes that the scope of review provisions of the APA , 5 U.S.C. Sec. 706,[19] which implicitly embody equitable principles, apply in actions "in the nature of mandamus." Kelley v. Metropolitan County Board of Education, supra, 372 F.Supp. at 359.

■ The court holds that the APA applies to this case. Judicial review of the Secretary's action in this case is not precluded by statute. The relevant statutes are not drawn in such broad terms that there is no law to apply, so the agency action in question is not committed to agency discretion by law. Citizens to Preserve Overton Park, supra. The categorical exclusion of non-school Head Start programs from Sec. 1761(c)(2) reimbursement is final agency action, and the plaintiffs, as noted above, have standing to maintain this suit.

■ The court accordingly has jurisdiction to grant relief in the nature of mandamus.

### III.

The issue on the merits in this case is whether the Secretary of Agriculture has statutory authority to categorically exclude non-school Head Start programs from participation in the 80 per cent of food service operating cost reimbursement provisions of the Special Food Service Program, Sec. 13(c)(2) of the National School Lunch Act, as amended, 42 U.S.C. Sec. 1761(c)(2). Such reimbursement is to be provided only "[i]n circumstances of severe need where the rate per meal established by the Secretary [of Agriculture] is insufficient to carry on an effective feeding program."[20]

The plaintiffs contend that the Secretary's categorical exclusion of non-school Head Start programs from Sec. 1761(c)(2) benefits is beyond the scope of the Secretary's authority under the National School Lunch Act, as amended, or any other act of Congress. The plaintiffs further contend that such a categorical exclusion is arbitary and a violation of the Fifth Amendment. They allege that the Secretary's categorical exclusion has generally reduced the amount of reimbursement given to non-school Head Start programs for the service of meals by more than one quarter, with the result that services to the ultimate beneficiaries of Congress's action, the children in need, must be reduced.

The defendants contend that the Secretary's categorical exclusion of non-school Head Start programs from the 80 per cent of food operating cost reimbursement provisions of the SFSP is fully within the scope of the Secretary's authority under Sec. 1761 and Sec. 10 of the Child Nutrition Act of 1966, 42 U.S.C. Sec. 1779. They contend that the Secretary's limitation on the reimbursement allowed to non-school Head

view in cases where Congress, perhaps through mere inattention, has not expressly provided for judicial review in the relevant substantive statutes. To construe the mandamus statute narrowly and to hold that the APA is not jurisdictional would preclude judicial review in many cases where Congress has not positively expressed any intention to so restrict judicial review. Such a result cannot be squared with the presumption of reviewability announced in Abbott Laboratories, supra, or with the decision and rationale of Citizens to Preserve Overton Park, supra. Such a result would give the executive effective power to ignore Congress in a wide variety of circumstances.

19. 5 U.S.C. Sec. 706 provides, in part: "The reviewing court shall—(1) *compel agency ac-*

*tion unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conlusions found to be*—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right* . . . ." (Emphasis added.) A suit against a federal officer to compel agency action unlawfully withheld or to set aside agency action in excess of statutory jurisdiction or short of statutory right is plainly a suit "in the nature of mandamus."

20. Sec. 1761(c)(2) is quoted in full supra note 3.

Start programs "is, in effect, a finding that as a class they are not in circumstances of severe need and, therefore, do not qualify for additional financial assistance." Def. Supplementary Brief, at 5–6. See also, Def. Memorandum of Points, at 8. This alleged "finding" is purportedly based upon a HEW Position Paper of August 7, 1973, attached to the defendants' motion to dismiss, in which HEW stated that excluding Head Start programs from the 80 per cent of food operating cost reimbursement provisions would result in administrative savings which "would be enough to permit OCD to absorb other nutrition costs and to meet nutrition program performance standards without cutting quality in other program areas."

Along the same lines, the defendants contend that the categorical exclusion is reasonable and has a rational basis. The flat rate per meal reimbursement policy has the virtue of administrative simplicity and compatibility with the current Head Start accounting system. The 80 per cent of food operating costs can only be provided on the basis of actual operating costs of each program. Such food operating costs are imperfectly reflected in current Head Start budget categories. Providing 80 percent of food operating costs, it is alleged, would require complicated accounting changes, would risk dual funding, would require detailed, and therefore expensive, administrative oversight, and would be administratively inefficient because it would require increased USDA participation with HEW in the administration of Head Start programs. Although no estimated figures are provided, the defendants seem to be alleging that the administrative costs per dollar of actual benefit in the 80 per cent of food operating cost reimbursement category are so high as to make it inadvisable to include non-school Head Start programs in that category.

Congress's division of authority between USDA and HEW with regard to food service in Head Start programs is indeed curious. HEW is given general authority to administer "Project Head Start;" and each Head Start program is required to provide comprehensive nutritional services, 42 U.S.C. Sec. 2809 (a)(1). On the other hand, USDA is given general authority over the Special Food Service Program, which is to provide at least some funds for food service in Head Start programs. 42 U.S.C. Sec. 1761. Obviously, there is an overlap of authority here. This suggests that Congress may have inadvertently created major difficulties by twice funding the same program.

Further inquiry, however, reveals that this is not so. Public Law 90–302, which established the Special Food Service Program, provides in Section 1: "Appropriations shall be considered Health, Education and Welfare functions for budget purposes rather than functions of Agriculture."[21] 82 Stat. 117 (1968). While the Congress was giving certain operational authority over SFSP to USDA because of the food component, it was also clearly stating that the appropriated funds, though channeled through USDA, were to be considered part of the HEW budget.

It is admitted that Head Start programs are "service institutions" within the meaning of Sec. 1761. A review of Congressional debates reveals that Congress specifically intended to include Head Start programs within the SFSP. Representative Pucinski said on the floor of the House, "What we are proposing today is *a total approach to the problem of hungry or undernourished children.* What we are proposing is a rational, deliberate extension of food service benefits *to children wherever they are gathered in organized group situations.* It may be a settlement house or a neighborhood house, a community

21. This sentence was added to the committee's bill by Representative Poage on the floor of the House. 114 Cong.Rec. 5272–73 (1968). Debate on the amendment makes it clear that the sentence was intended to apply to the SFSP. Id. at 5260, 5272–73.

center—rural or urban— where children appear for group activities." 114 Cong. Rec. 5261 (1968). (Emphasis added.) Senator Young said, "A service institution is defined as any public or private nonprofit institution such as a day-care or *Headstart center* . . . ." Id. at 9727 (emphasis added).

More important for the present case is a 1972 amendment to the statute establishing the SFSP. Public Law 92–433, Sec. 2, removed the limited appropriation authorization contained in previous measures, Pub.L. 92–32, 85 Stat. 86 (1971); Pub.L. 90–302, 82 Stat. 117 (1968), and added the following: "There is hereby authorized to be appropriated *such sums as are necessary* for each of the fiscal years ending June 30, 1973, June 30, 1974, and June 30, 1975, to enable the Secretary [of Agriculture] to formulate and carry out a program to assist States through grants-in-aid and other means *to initiate, maintain, or expand nonprofit food service programs for children in service institutions*." 86 Stat. 724 (1972) (emphasis added). Senator Javits said on the floor of the Senate, "[T]his legislation would extend special—*nonschool*—*food assistance* through June 30, 1975, and increase the appropriation to 'such sums as are necessary.' *The understanding in this particular authorization item is that all institutions making application for such assistance, which agree to carry out the program in accordance with the act, will receive such financial assistance.*" 118 Cong.Rec. 28598 (1972) (emphasis added). Senator Kennedy emphasized that the bill provided "open ended authorization for *full funding of food assistance programs in Head Start*, Day Care and in other preschool projects." Id. at 28567 (emphasis added). See also, Statement of Senator McGovern, Chairman of the Senate Select Committee on Nutrition and Human Needs, id. at 28565–66. In the House, Representative Mink said that the bill would authorize special food programs in "Headstart centers." Id. at 23420. There was no recorded dissent from these statements in either the House or the Senate.

In making SFSP appropriations part of the HEW budget, and in providing an open-ended authorization for SFSP appropriations to Head Start programs, Congress specifically intended the SFSP to provide the funding for the nutritional component of Project Head Start. Head Start has many missions. According to the HEW Position Paper of August 7, 1973, there is no separate Congressional HEW budget category for Head Start's food component. Thus, Congress also intended that the SFSP funding of the Head Start nutritional component be cumulative with, that is, in addition to, the general Head Start funding already provided. By channeling Head Start food service money through SFSP, Congress was ensuring that the Head Start nutritional component would be funded so far as possible without detracting from other aspects of Head Start, just as school breakfast and lunch programs were fully funded without requiring schools, public or private, to significantly reduce educational activities to qualify for federal support.

 The defendants nonetheless contend that the Secretary of Agriculture had discretionary authority to categorically exclude nonschool Head Start programs from the 80 per cent reimbursement provisions of the SFSP. The Secretary finds warrant, in part, in Section 10 of the Child Nutrition Act of 1966, as amended, 42 U.S.C. Sec. 1779, which grants the Secretary authority to prescribe regulations to carry out the Child Nutrition Act and the National School Lunch Act, of which SFSP is a part. However, it is plain that the Congress was *granting the Secretary authority to promulgate interpretative regulations only,* and was not authorizing the Secretary to promulgate regulations themselves having the force of law or departing from Congress's statutory limitations. The Congress intended only to give the Secretary authority to make reasonable adjustments of detail to

accommodate differences among states and service institutions, see Pub.L. 91–248, esp. Sec. 8, 84 Stat. 207 (1970); H.R.Rep.No.91–81, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Congressional & Administrative News 3014, not to eliminate whole sections of mandated aid.[22]

Referring to the terms of 42 U.S.C. Sec. 1761(c)(2), the defendants contend that the categorical exclusion of non-school Head Start programs from the 80 per cent reimbursement provisions "is, in effect, a finding that as a class they are not in circumstances of severe need and, therefore, do not qualify for additional financial assistance." Def. Supplementary Brief, at 5–6; Def. Memorandum of Points, at 8. This "finding" has two distinct but related bases which must be examined.

The defendants contend that the non-school Head Start programs are not in circumstances of severe need within the meaning of the statute simply because OCD, a federal agency, alone provides funds for non-school Head Start programs' food operating costs. Def. Memorandum of Points, at 9. However, this proposition is impossible to reconcile with the statutory declaration that SFSP appropriations shall be considered HEW functions for budget purposes, or with the Congressional intent that the SFSP provide the funding for the nutrition component of Head Start. SFSP funds were originally intended to go to a wide range of institutions, some of which were partially funded by state and private agencies, or partially supported by payments from the working mothers of attending children. The "circumstances of severe need" in the statute ultimately refer to a combination of factors, including the relative poverty of children attending a particular institution and that institution's alternative sources of funds. Appendix B to the HEW Position Paper of August 7, 1973, reveals that OCD funding is inadequate to meet fully the nutritional component of individual Head Start programs.[23] Congress did not intend that non-school Head Start projects beggar all non-nutritional aspects of their programs before qualifying for 80 per cent of food operating cost reimbursement.

All school-related Head Start programs are eligible to apply for 100% of breakfast operating costs under the School Breakfast Program, 42 U.S.C. Sec. 1773(d); Stip. No. 9. Sec. 1773(d) funds, like those under Sec. 1761(c)(2), cannot be given except in "circumstances of severe need." Neither 42 U.S.C. Sec. 1779 nor Sec. 1781 gives the Secretary the authority to set aside this specific statutory "need" requirement for school-related Head Start programs. In allowing school-related Head Start programs to apply for 100% funding for breakfast operating costs under Sec. 1773(d), the Secretary must have concluded that school-related Head Start programs are "in circumstances of severe need" notwithstanding funding by OCD. This conclusion is impossible to reconcile with the categorical exclusion of non-school Head Start programs from the 80 per

---

22. The defendants have not argued that the statutory provision that the Secretary "may" grant 80 per cent of food operating cost reimbursement confers upon the Secretary an absolute and unreviewable discretion to withhold such reimbursement. In light of the statutory context and legislative history, such an argument would be unsupportable. See Thompson v. Clifford, 132 U.S.App.D.C. 351, 408 F.2d 154, 158–59 (1968); cf., Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); W. G. Cosby Transfer & Storage Corp. v. Froehlke, 480 F.2d 498 (4th Cir. 1973).

23. See also Part II.A. of the HEW Position Paper, which states:

Since the inception of Project Head Start in 1965, policy guidelines have required that a nutrition program including *feeding be provided for all children.* Although no funds were appropriated to Head Start specifically for food, funds could be expended for that purpose. With increasing food and labor costs, unmet needs for technical assistance in nutrition and training of food service workers, lack of adequate food preparation facilities and equipment, etc., the problem of sufficient Head Start dollars to maintain and improve the nutrition as well as other components of Head Start programs is becoming more acute. (Emphasis added.)

cent of food operating cost provisions of SFSP, 42 U.S.C. Sec. 1761(c)(2). There is no established funding differentiation between Head Start programs administered by schools and those administered by other agencies. Stip. No. 8. Sec. 1761(c)(2) was deliberately patterned after Sec. 1773(d) by Congress.

■ The Secretary's "finding" that non-school Head Start programs are not "in circumstances of severe need" simply because of OCD funding has no basis in law or in fact. The discrimination between non-school and school-related Head Start programs with regard to reimbursement for food operating costs is arbitrary and capricious.

The defendants also contend that the Secretary's "finding" that non-school Head Start programs are not in circumstances of severe need is supported by representations made by HEW in its Position Paper of August 7, 1973. In this document, which was sent to the Department of Agriculture and the Office of Management and Budget, HEW stated:

> "HEW agrees with USDA officials that the flat rate can be defended as standard practice and is not arbitrary in its effects; it would avoid considerable administrative burden on both USDA and OCD of calculating and basing reimbursement on actual costs in each local program annually; *and the ensuing budgetary relief would be enough to permit OCD to absorb other nutrition costs and to meet nutrition program performance standards without cutting quality in other program areas.*" (Emphasis added).

The court observes that HEW, in its Position Paper, expressly presumes that non-school Head Start programs are eligible for 80 per cent of food operating cost reimbursement, but says that a limitation to flat rate reimbursement "can be defended" on certain budgetary considerations of a practical nature. For purposes of legal argument, the Secretary of Agriculture has adopted HEW's budgetary considerations, but rejected its presumption as to non-school Head Start programs' eligibility under Sec. 1761(c)(2).

HEW's presumption is well-founded. "In circumstances of severe need" in Sec. 1761(c)(2) refers to the need of "service institutions." OCD is itself not a "service institution." As noted above, under the present system, it cannot categorically be said that non-school Head Start programs are not "in circumstances of severe need."

■ The HEW Position Paper, and the defendants' argument, assumes that OCD is primarily and fully responsible for administrative expenses in connection with SFSP funds going to Head Start programs. This is an erroneous assumption. 42 U.S.C. Sec. 1761(h)(4) authorizes the appropriation for any fiscal year of such sums as may be necessary to the Secretary of Agriculture for his administrative expenses under SFSP. 42 U.S.C. Sec. 1761(h)(5) imposes upon the Secretary the duty of monitoring and auditing State educational agencies and service institutions to determine whether there has been compliance with the statutes and regulations. Obviously, OCD and USDA should not perform identical monitoring and audits. If OCD performs functions which Congress has assigned to USDA under SFSP, then an adjustment of accounts may be necessary. If it is unable to meet SFSP administrative expenses, USDA ought to seek a supplemental appropriation from Congress under Secs. 1761(h)(4) and (5). Only if Congress is unwilling, on specific application, to provide the Department of Agriculture with the authorized and necessary funds, should OCD be called upon to absorb SFSP administrative costs.[24]

---

24. Unfortunately, the record does not reveal how HEW and USDA allocate functions and administrative expenses for school-related Head Start projects, or what the amount of these expenses is, or the percentage of total funding which must be allocated to administration.

There are accommodations to practicality which both HEW and USDA can make to reduce the total burden and expense of administering SFSP. However, the facts that accounting procedures may have to be revised and that it may be relatively expensive to make determinations of need for each service institution under Sec. 1761(c)(2) are no warrant for declaring non-school Head Start programs categorically ineligible to apply for or to receive Sec. 1761(c)(2) funds. Congress was certainly aware of the high administrative expense involved in making individual determinations, and Congress decided that the expense should be incurred in connection with the program. HEW and USDA cannot stipulate between themselves and contrary to the intent of Congress that because Congress has created an administrative burden which neither agency wants to bear, no Sec. 1761(c)(2) funds shall go to non-school Head Start programs under any circumstances.

The Secretary's "finding" that non-school Head Start programs are not in circumstances of severe need is, so far as it relies upon representations contained in HEW's Position Paper of August 7, 1973, based upon erroneous conclusions of fact and law.

■ On the whole, the court concludes that the Secretary of Agriculture exceeded his authority under the statutes governing the Special Food Service Program in categorically excluding non-school Head Start programs from eligibility for reimbursement under the 80 per cent of food operating cost provisions, 42 U.S.C. Sec. 1761(c)(2). The court finds that there is no genuine issue as to any material fact, and that the plaintiffs are entitled to a judgment as a matter of law.

It is therefore ordered that the plaintiffs' motion for summary judgment is hereby granted. A judgment shall be entered declaring that the Secretary of Agriculture exceeded his authority under the statutes governing the Special Food Service Program, 42 U.S.C. Sec. 1761, in categorically excluding non-school Head Start programs not participating as of 1969 from eligibility for reimbursement for 80 per cent of their food operating costs under 42 U.S.C. Sec. 1761(c)(2), and that such categorical exclusion is contrary to law.

It is further ordered, that an injunction shall issue requiring the Secretary of Agriculture to rescind regulations or instructions which have the effect of categorically excluding non-school Head Start programs from eligibility for reimbursement for 80 per cent of their food operating costs under 42 U.S.C. Sec. 1761(c)(2). The injunction shall also require the Secretary to amend existing regulations or promulgate new ones consistent with applicable statutes to enable non-school Head Start programs to apply for and, if they qualify, to receive reimbursement for up to 80 per cent of their food operating costs under 42 U.S. C. Sec. 1761(c)(2). The injunction shall also require the Secretary to reimburse those non-school Head Start programs which qualify under 42 U.S.C. Sec. 1761 (c)(2) from the date of the injunction, or, at his option, from such earlier date as is administratively most convenient. The injunction shall also require the Secretary to consult fully with the appropriate officials at the Department of Health, Education and Welfare, and to coordinate his activities with those officials to achieve the maximum administrative efficiency possible under the circumstances. This injunction shall be executed in good faith and shall be subject to alteration by this court for good cause shown on motion by any party to this suit.

It is further ordered that the Clerk of the Court shall serve by mail or otherwise true copies of this Opinion and Order, the Judgment which shall be entered, and the Injunction which shall issue upon the Secretary of the Department of Health, Education and Welfare.

*APPENDIX A.*

Excerpts from H.R.Rep.No.1114, 90th Cong., 1st Sess (1968),[1] on the bill to establish the Special Food Services Program.

### HOUSE REPORT NO. 1114

The Committee on Education and Labor, to whom was referred the bill (H.R. 15398) to amend the National School Lunch Act to strengthen and expand food service programs for children, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

### I. SUMMARY

H.R. 15398 would amend the National School Lunch Act to extend its coverage to institutions which provide day care and other nonresidential child care for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers, and which provide day-care services for handicapped children. These institutions must be public or private nonprofit institutions, such as child day-care centers, settlement houses, or recreation centers. The bill provides for an authorization of $32 million a year for fiscal 1969, 1970, and 1971 for this program. In addition, H.R. 15398 would amend the Child Nutrition Act by extending the authorization for the pilot breakfast program. The present authorization expires June 30, 1968.

### II. PURPOSE

H.R. 15398 is intended to fulfill two purposes: to extend the national school lunch program to child care institutions and to put the pilot breakfast program on a permanent basis.

The National School Lunch Act presently provides Federal assistance to the States to carry on school lunch programs at reduced costs to recipients. Because that act is limited to programs carried on by schools, a great nutritional need exists among preschool children, and also among school-age children during the summer months. This bill proposes to meet this need by providing food assistance programs to day-care and other child-care institutions for children from areas in which poor economic conditions exist and from areas in which there are high concentrations of working mothers. Other public and private nonprofit institutions which provide day-care services for handicapped children are also included. These institutions, including day-care centers, settlement houses, nonresidential summer camps and playgrounds, will be aided in their food programs.

The bill authorizes the appropriation of funds to the Secretary of Agriculture for assistance to these institutions for the purpose of buying food supplies and equipment used to store, prepare, or serve such food supplies. It further authorizes the distribution by the Secretary of Agriculture of agricultural commodities acquired under price support and surplus removal operations to be used in child food service programs in these institutions.

The bill closely parallels the National School Lunch Act to which it is intended to serve as a complement. Meals may be served to children participating in programs operated by these service institutions. Experience has proven that the inadequate diets received by too many youths handicap them throughout their lives. Many medical problems have their origins in deficient nutrition and poor eating habits acquired during childhood. Faulty nutrition cannot only result in physical disabilities, but also in mental disorders and retardation. Lack of ambition and motivation can often be traced to vitamin and mineral deficiencies.

---

1. From 1968 U.S.Code Congressional & Administrative News 1932–33.

Testimony before the subcommittee highlighted a great national need for day-care and other child-care institutions. Recent congressional provisions stress day-care facilities in the model cities program, in the authority granted the Office of Economic Opportunity, and in the Social Security Amendments of 1969. The statistics underlying the need for these facilities are staggering. In March 1965, 4.5 million children under the age of 6 had working mothers. There were nearly another 6.5 million children between the ages of 6 and 11 whose mothers held jobs. There are 725,000 children in families in which the family income is less than $5,000 and where the mother works full time, almost a million additional children in this same category in ages 6 to 11. Many of these mothers are the heads of fatherless homes; some work to augment meager family incomes. One-third of the women who are now working are mothers, and economists tell us that the number will continue to rise. Their children must receive adequate care and proper food.

This program will be administered by the Department of Agriculture operating through the State educational agencies, as in the National School Lunch and Child Nutrition Acts. Meal type standards which make a positive contribution to good nutrition must be met as a condition for receiving assistance, as in the school lunch and breakfast programs. In circumstances of severe need, up to 80 percent of the operating costs of the food service program may be funded, as in the breakfast program. State educational agencies may receive limited financial assistance for program administration, as in the breakfast program and special assistance phase of the national school lunch program.[2]

---

2. The clear intent of Congress in creating the Special Food Service Program was to feed hungry or undernourished children who were not reached through the National School Lunch Act.