# TRAIN, ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY *v.* CITY OF NEW YORK ET AL.

No. 73–1377.   Argued November 12, 1974— Decided February 18, 1975

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., concurred in the result.

*Solicitor General Bork* argued the cause for petitioner. With him on the briefs were *Assistant Attorney General Hills, Deputy Solicitor General Friedman, Edmund W. Kitch, William L. Patton, Robert E. Kopp, Eloise E. Davies,* and *David M. Cohen.*

*John R. Thompson* argued the cause for respondent city of New York. With him on the briefs were *Adrian P. Burke, Gary Mailman,* and *Alexander Gigante, Jr.**

*Briefs of *amici curiae* were filed by *Evelle J. Younger,* Attorney General, *pro se, Robert H. O'Brien,* Senior Assistant Attorney General, and *Nicholas C. Yost,* Deputy Attorney General, for the Attorney General of California; by *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman* and *Charles Alpert,* Assistant Attorneys General, for the State of Michigan; by *Warren Spannaus,* Attorney General, *Byron E. Starns,*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case poses certain questions concerning the proper construction of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp III) (1972 Act), which provide a comprehensive program for controlling and abating water pollution. Section 2 of the 1972 Act, 86 Stat. 833, in adding Title II, §§ 201–212, to the Federal Water Pollution Control Act, 62 Stat. 1155, 33 U. S. C. §§ 1281–1292 (1970 ed., Supp. III),[1] makes available federal finan-

Deputy Attorney General, *Peter W. Sipkins,* Solicitor General, and *Eldon G. Kaul,* Special Assistant Attorney General, for the State of Minnesota; by *William F. Hyland,* Attorney General, *pro se, Stephen Skillman,* Assistant Attorney General, and *John M. Van Dalen,* Deputy Attorney General, for the Attorney General of New Jersey; by *William J. Brown,* Attorney General, and *Richard P. Fahey* and *David E. Northrop,* Assistant Attorneys General, for the State of Ohio; by *John L. Hill,* Attorney General, *Larry F. York,* First Assistant Attorney General, and *Philip K. Maxwell,* Assistant Attorney General of Texas, *Robert W. Warren,* Attorney General, and *Theodore L. Priebe,* Assistant Attorney General of Wisconsin, *John C. Danforth,* Attorney General, and *Robert M. Lindholm,* Assistant Attorney General of Missouri, *Larry Derryberry,* Attorney General, and *Paul C. Duncan,* Assistant Attorney General of Oklahoma, and *Vern Miller,* Attorney General, and *Curt T. Schneider,* Assistant Attorney General of Kansas, for the States of Texas, Wisconsin, Missouri, Oklahoma, and Kansas; by *Andrew P. Miller,* Attorney General, *Gerald L. Baliles,* Deputy Attorney General, and *James E. Ryan, Jr.,* Assistant Attorney General, for the Commonwealth of Virginia; by *Slade Gorton,* Attorney General, *Charles B. Roe, Jr.,* Senior Assistant Attorney General, and *Martin J. Durkan* and *James B. McCabe,* Special Assistant Attorneys General of Washington, and *Israel Packel,* Attorney General, and *James R. Adams,* Deputy Attorney General of Pennsylvania, for the State of Washington and the Commonwealth of Pennsylvania; and by *Fletcher N. Baldwin, Jr.,* for the Center for Governmental Responsibility.

[1] The provisions of Title II, as added by the 1972 Amendments chiefly involved in this case are, in pertinent part, as follows:

cial assistance in the amount of 75% of the cost of municipal sewers and sewage treatment works. Under § 207, there is "authorized to be appropriated" for these purposes

Section 205 (a), 33 U. S. C. § 1285 (a) (1970 ed., Supp. III):

"Sums authorized to be appropriated pursuant to section 1287 of this title for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after October 18, 1972. . . ."

Section 207, 33 U. S. C. § 1287 (1970 ed., Supp. III):

"There is authorized to be appropriated to carry out this subchapter . . . for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,000,000, and for the fiscal year ending June 30, 1975, not to exceed $7,000,000,000."

Section 203, 33 U. S. C. § 1283 (1970 ed., Supp. III):

"(a) Each applicant for a grant shall submit to the Administrator for his approval, plans, specifications, and estimates for each proposed project for the construction of treatment works for which a grant is applied for [sic] under section 1281 (g) (1) of this title from funds allotted to the State under section 1285 of this title and which otherwise meets the requirements of this chapter. The Administrator shall act upon such plans, specifications, and estimates as soon as practicable after the same have been submitted, and his approval of any such plans, specifications, and estimates shall be deemed a contractual obligation of the United States for the payment of its proportional contribution to such project.

"(b) The Administrator shall, from time to time as the work progresses, make payments to the recipient of a grant for costs of construction incurred on a project. These payments shall at no time exceed the Federal share of the cost of construction incurred to the date of the voucher covering such payment plus the Federal share of the value of the materials which have been stockpiled in the vicinity of such construction in conformity to plans and specifications for the project.

"(c) After completion of a project and approval of the final voucher by the Administrator, he shall pay out of the appropriate sums the unpaid balance of the Federal share payable on account of such project."

"not to exceed" $5 billion for fiscal year 1973, "not to exceed" $6 billion for fiscal year 1974, and "not to exceed" $7 billion for fiscal year 1975. Section 205 (a) directs that "[s]ums authorized to be appropriated pursuant to [§ 207]" for fiscal year 1973 be allotted "not later than 30 days after October 18, 1972." The "[s]ums authorized" for the later fiscal years 1974 and 1975 "shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized . . . ." From these allotted sums, § 201 (g)(1) authorizes the Administrator "to make grants to any . . . municipality . . . for the construction of publicly owned treatment works . . . ," pursuant to plans and specifications as required by § 203 and meeting the other requirements of the Act, including those of § 204. Section 203 (a) specifies that the Administrator's approval of plans for a project "shall be deemed a contractual obligation of the United States for the payment of its proportional contribution to such project." [2]

_____

[2] The Act thus established a funding method differing in important respects from the normal system of program approval and authorization of appropriation followed by separate annual appropriation acts. Under that approach, it is not until the actual appropriation that the Government funds can be deemed firmly committed. Under the contract-authority scheme incorporated in the legislation before us now, there are authorizations for future appropriations but also initial and continuing authority in the Executive Branch contractually to commit funds of the United States up to the amount of the authorization. The expectation is that appropriations will be automatically forthcoming to meet these contractual commitments. This mechanism considerably reduces whatever discretion Congress might have exercised in the course of making annual appropriations. The issue in this case is the extent of the authority of the Executive to control expenditures for a program that Congress has funded in the manner and under the circumstances present here.

The water pollution bill that became the 1972 Act was passed by Congress on October 4, 1972, but was vetoed by the President on October 17. Congress promptly overrode the veto. Thereupon the President, by letter dated November 22, 1972,[3] directed the Administrator "not [to] allot among the States the maximum amounts provided by section 207" and, instead, to allot "[n]o more than $2 billion of the amount authorized for the fiscal year 1973, and no more than $3 billion of the amount authorized for the fiscal year 1974 . . . ."[4] On December 8, the Administrator announced by regulation [5] that in accordance with the President's letter he was allotting for fiscal years 1973 and 1974 "sums not to exceed $2 billion and $3 billion, respectively."

This litigation, brought by the city of New York and similarly situated municipalities in the State of New York, followed immediately.[6] The complaint sought judgment against the Administrator of the Environmental Protection Agency declaring that he was obligated to allot to the States the full amounts authorized by § 207 for fiscal years 1973 and 1974, as well as an order directing him to make those allotments. In May 1973, the District Court denied the Administrator's motion to dismiss and granted the cities' motion for summary judgment. The Court of Appeals affirmed, holding that "the Act requires the Administrator to allot the full sums authorized to be ap-

---

[3] Letter from President Nixon to William D. Ruckelshaus, Administrator, Environmental Protection Agency, Nov. 22, 1972, App. 15–16.

[4] Although the allotment for fiscal year 1975 is not directly at issue in this case, on January 15, 1974, the Administrator allotted $4 billion out of the $7 billion authorized for allotment for that fiscal year. Brief for Petitioner 6.

[5] 37 Fed. Reg. 26282 (1972).

[6] The District Court ordered the action to proceed as a class action under Fed. Rules Civ. Proc. 23 (b)(1) and (2) and also allowed the city of Detroit to intervene as a plaintiff.

propriated in § 207." 161 U. S. App. D. C. 114, 131, 494 F. 2d 1033, 1050 (1974).

Because of the differing views with respect to the proper construction of the Act between the federal courts in the District of Columbia in this case and those of the Fourth Circuit in *Train* v. *Campaign Clean Water, post,* p. 136, we granted certiorari in both cases, 416 U. S. 969 (1974), and heard them together. The sole issue [7] before us is whether the 1972 Act permits the Administrator to allot to the States under § 205 (a) less than the entire amounts authorized to be appropriated by § 207. We hold that the Act does not permit such action and affirm the Court of Appeals.[8]

---

[7] The petition for a writ of certiorari also presented the question whether a suit to compel the allotment of the sums in issue here is barred by the doctrine of sovereign immunity, but that issue was not briefed and apparently has been abandoned. The Administrator concedes that, if § 205 (a) requires allotment of the full amounts authorized by § 207, then "allotment is a ministerial act and the district courts have jurisdiction to order that it be done." Brief for Petitioner 14.

[8] On July 12, 1974, while this case was pending in this Court the Congressional Budget and Impoundment Control Act of 1974, Pub. L. 93–344, 88 Stat. 297, 31 U. S. C. § 1301 *et seq.* (1970 ed., Supp. IV), became effective. Title X of that Act imposes certain requirements on the President in postponing or withholding the use of authorized funds. If he determines that certain budget authority will not be required to carry out a particular program and is of the view that such authority should be rescinded, he must submit a special message to Congress explaining the basis therefor. For the rescission to be effective, Congress must approve it within 45 days. Should the President desire to withhold or delay the obligation or expenditure of budget authority, he must submit a similar special message to Congress. His recommendation may be rejected by either House adopting a resolution disapproving the proposed deferral.

These provisions do not render this case moot or make its decision unnecessary, for § 1001, note following 31 U. S. C. § 1401 (1970 ed., Supp. IV), provides that:

Section 205 (a) provides that the "[s]ums authorized to be appropriated pursuant to [§ 207] . . . shall be allotted by the Administrator." Section 207 authorizes the appropriation of "not to exceed" specified amounts for each of three fiscal years. The dispute in this case turns principally on the meaning of the foregoing language from the indicated sections of the Act.

The Administrator contends that § 205 (a) directs the allotment of only "sums"—not "all sums"—authorized by § 207 to be appropriated and that the sums that must be allotted are merely sums that do not exceed the

"Nothing contained in this Act, or in any amendments made by this Act, shall be construed as—

.          .          .          .          .

"(3) affecting in any way the claims or defenses of any party to litigation concerning any impoundment."

The Act would thus not appear to affect cases such as this one, pending on the date of enactment of the statute. The Solicitor General, on behalf of the Administrator, has submitted a supplemental brief to this effect. The city of New York agrees that the case has not been mooted by the Impoundment Act and no contrary views have been filed.

Although asserting on the foregoing ground and on other grounds that the Impoundment Act has no application here, the Executive Branch included among the deferrals of budget authority reported to Congress pursuant to the new Act:

"Grants for waste treatment plant construction ($9 billion). Release of all these funds would be highly inflationary, particularly in view of the rapid rise in non-Federal spending for pollution control. Some of the funds now deferred will be allotted on or prior to February 1, 1975."

In connection with that submission, the President asserted that the Act "applies only to determinations to withhold budget authority which have been made since the law was approved," but nevertheless thought it appropriate to include in the report actions which were concluded before the effective date of the Act. 120 Cong. Rec. S17195 (Sept. 23, 1974). Other than as they bear on the possible mootness in the litigation before us, no issues as to the reach or coverage of the Impoundment Act are before us.

amounts specified in § 207 for each of the three fiscal years. In other words, it is argued that there is a maximum, but no minimum, on the amounts that must be allotted under § 205 (a). This is necessarily the case, he insists, because the legislation, after initially passing the House and Senate in somewhat different form, was amended in Conference and the changes, which were adopted by both Houses, were intended to provide wide discretion in the Executive to control the rate of spending under the Act.

The changes relied on by the Administrator, the so-called Harsha amendments, were two. First, § 205 of the House and Senate bills as they passed those Houses and went to Conference, directed that there be allotted "all sums" authorized to be appropriated by § 207.[9] The word "all" was struck in Conference. Second, § 207 of the House bill authorized the appropriation of specific amounts for the three fiscal years. The Conference Committee inserted the qualifying words "not to exceed" before each of the sums so specified.

The Administrator's arguments based on the statutory language and its legislative history are unpersuasive. Section 207 authorized appropriation of "not to exceed" a specified sum for each of the three fiscal years. If the States failed to submit projects sufficient to require obligation, and hence the appropriation, of the entire amounts authorized, or if the Administrator, exercising whatever authority the Act might have given him to deny grants, refused to obligate these total amounts, § 207 would obviously permit appropriation of the lesser amounts. But if, for example, the full amount provided for 1973 was obligated by the Administrator in the course of

---

[9] Section 205 as it appeared in the Senate bill directed the Administrator to "allocate" rather than to "allot." The difference appears to be without significance.

approving plans and making grants for municipal contracts, § 207 plainly "authorized" the appropriation of the entire $5 billion. If a sum of money is "authorized" to be appropriated in the future by § 207, then § 205 (a) directs that an amount equal to that sum be allotted. Section 207 speaks of sums authorized to be appropriated, not of sums that are required to be appropriated; and as far as § 205 (a)'s requirement to allot is concerned, we see no difference between the $2 billion the President directed to be allotted for fiscal year 1973 and the $3 billion he ordered withheld. The latter sum is as much authorized to be appropriated by § 207 as is the former. Both must be allotted.

It is insisted that this reading of the Act fails to give any effect to the Conference Committee's changes in the bill. But, as already indicated, the "not to exceed" qualifying language of § 207 has meaning of its own, quite apart from § 205 (a), and reflects the realistic possibility that approved applications for grants from funds already allotted would not total the maximum amount authorized to be appropriated. Surely there is nothing inconsistent between authorizing "not to exceed" $5 billion for 1973 and requiring the full allotment of the $5 billion among the States. Indeed, if the entire amount authorized is *ever* to be appropriated, there must be approved municipal projects in that amount, and grants for those projects may *only* be made from allotted funds.

As for striking the word "all" from § 205, if Congress intended to confer any discretion on the Executive to withhold funds from this program at the allotment stage, it chose quite inadequate means to do so. It appears to us that the word "sums" has no different meaning and can be ascribed no different function in the context of § 205 than would the words "all sums." It is said that

the changes were made to give the Executive the discretionary control over the outlay of funds for Title II programs at either stage of the process. But legislative intention, without more, is not legislation. Without something in addition to what is now before us, we cannot accept the addition of the few words to § 207 and the deletion of the one word from § 205 (a) as altering the entire complexion and thrust of the Act. As conceived and passed in both Houses, the legislation was intended to provide a firm commitment of substantial sums within a relatively limited period of time in an effort to achieve an early solution of what was deemed an urgent problem.[10] We cannot believe that Congress at the last

---

[10] The Act declares that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985," § 101 (a) (1), 33 U. S. C. § 1251 (a) (1) (1970 ed., Supp. III). Congress intended also to apply to publicly owned sewage treatment works "the best practicable waste treatment technology over the life of the works consistent with the purposes of this subchapter." § 201 (g) (2) (A), 33 U. S. C. § 1281 (g) (2) (A) (1970 ed., Supp. III). See § 301 (b) (1) (B), 33 U. S. C. § 1311 (b) (1) (B) (1970 ed., Supp. III). The congressional determination to commit $18 billion during the fiscal years 1973–1975 is reflected in the following remarks of Senator Muskie, the Chairman of the Senate Subcommittee concerned with the legislation and the manager of the bill on the Senate floor:

"[T]hose who say that raising the amounts of money called for in this legislation may require higher taxes, or that spending this much money may contribute to inflation simply do not understand the language of this crisis.

"The conferees spent hours and days studying the problem of financing the cleanup effort required by this new legislation. The members agreed in the end that a total of $18 billion had to be committed by the Federal Government in 75-percent grants to municipalities during fiscal years 1973–75. That is a great deal of money; but that is how much it will cost to begin to achieve the requirements set forth in the legislation.

. . . . .

". . . [T]here were two strong imperatives which worked together to convince the members of the conference that this much money was

minute scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation. Yet such was the Government's position in the lower courts—combined with the argument that the discretion conferred is unreviewable.

The Administrator has now had second thoughts. He does not now claim that the Harsha amendments should be given such far-reaching effect. In this Court, he views §§ 205 (a) and 207 as merely conferring discretion on the Administrator as to the timing of expenditures, not as to the ultimate amounts to be allotted and obligated. He asserts that although he may limit initial allotments in the three specified years, "the power to allot continues" and must be exercised, "until the full $18 billion has

---

needed: first, the conviction that only a national commitment of this magnitude would produce the necessary technology; and second, the knowledge that a Federal commitment of $18 billion in 75-percent grants to the municipalities was the minimum amount needed to finance the construction of waste treatment facilities which will meet the standards imposed by this legislation.

.        .        .        .        .

"Mr. President, to achieve the deadlines we are talking about in this bill we are going to need the strongest kind of evidence of the Federal Government's commitment to pick up its share of the load. We cannot back down, with any credibility, from the kind of investment in waste treatment facilities that is called for by this bill. And the conferees are convinced that the level of investment that is authorized is the minimum dose of medicine that will solve the problems we face." 118 Cong. Rec. 33693–33694 (1972).

Both Houses rejected authorization-appropriation funding in favor of the contract-authority system, which was deemed to involve a more binding and reliable commitment of funds. See 117 Cong. Rec. 38799, 38846–38853 (1971); 118 Cong. Rec. 10751–10761 (1972). Congressman Harsha, the House floor manager of the bill, explained the preference for the contract-authority approach and indicated that it was essential for orderly and continuous planning. *Id.*, at 10757–10758.

been exhausted."[11]   Brief for Petitioner 13; Tr. of Oral Arg. 16–17.   It is true that this represents a major modification of the Administrator's legal posture,[12] but our conclusion that § 205 (a) requires the allotment of sums equal to the total amounts authorized to be appropriated under § 207 is not affected.   In the first place, under § 205 (a) the Administrator's power to allot extends only to "sums" that are authorized to be appropriated under § 207.   If he later has power to allot, and must allot, the balance of the $18 billion not initially allotted in the specified years, it is only because these additional amounts are "sums" authorized by § 207 to be appropriated.   But if they are "sums" within the meaning of § 205 (a), then that section requires that they be allotted by November 17, 1972, in the case of 1973 funds, and for 1974 and 1975 "not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized."[13]   The November 22 letter of the President and the Administrator's consequent withholding of authorized funds cannot be squared with the statute.

Second, even assuming an intention on the part of

---

[11] The Administrator goes on to argue that under his present view of the Act, there is little if any difference between discretion to withhold allotments and discretion to refuse to obligate, for under either approach the full amounts authorized will eventually be available for obligation.   The city of New York contends otherwise.   Our view of the Act makes it unnecessary to reach the question.

[12] The Administrator now indicates that the Act is presently being administered in accordance with his view of the Act asserted here. Brief for Petitioner 13.

[13] Under § 205 (b), any funds allotted to a State that remain unobligated at the end of a one-year period after the close of the fiscal year for which funds are authorized become available for reallotment by the Administrator in accordance with a formula to be determined by the Administrator.   These provisions for reallotment, as well as the reallotment formula, plainly apply only to funds that have already been allotted.

Congress, in the hope of forestalling a veto, to imply a power of some sort in the Executive to control outlays under the Act, there is nothing in the legislative history of the Act indicating that such discretion arguably granted was to be exercised at the allotment stage rather than or in addition to the obligation phase of the process. On the contrary, as we view the legislative history, the indications are that the power to control, such as it was, was to be exercised at the point where funds were obligated and not in connection with the threshold function of allotting funds to the States.[14] The Court of Appeals carefully examined the legislative history in this respect and arrived at the same conclusion, as have most of the other courts that have dealt with the issue.[15] We thus

[14] Senator Muskie, who was the senior majority conferee from the Senate, gave his view of the meaning of the Harsha amendments on the floor of the Senate:

"Under the amendments proposed by Congressman William Harsha and others, the authorizations for obligational authority are 'not to exceed' $18 billion over the next 3 years. Also, 'all' sums authorized to be obligated need not be committed, though they must be allocated. These two provisions were suggested to give the Administration some flexibility concerning the obligation of construction grant funds." 118 Cong. Rec. 33694 (1972).

He repeated his views in the course of Senate proceedings to override the President's veto. *Id.*, at 36871. Nothing was said in the Senate challenging the Senator's view that executive discretion did not extend to allotments.

In the House, the power to make allotments under § 205 was not mentioned in terms. The impact of the Harsha amendments was repeatedly explained by reference to discretion to obligate or to expend. Typical was Representative Harsha's remarks that the amendments were intended to "emphasize the President's flexibility to control the rate of spending . . . ," and that "the pacing item" in the expenditure of funds was the Administrator's power to approve plans, specifications, and estimates. *Id.*, at 33754. See also *id.*, at 33693, 33704, 33715–33716, 33754–33755, 36873–36874, 37056–37060.

[15] 161 U. S. App. D. C. 114, 494 F. 2d 1033 (1974), aff'g 358 F. Supp. 669 (DC 1973). Other District Courts have reached this

reject the suggestion that the conclusion we have arrived at is inconsistent with the legislative history of §§ 205 (a) and 207.

Accordingly, the judgment of the Court of Appeals is affirmed.

*So ordered.*

MR. JUSTICE DOUGLAS concurs in the result.

---

same result: *Ohio ex rel. Brown* v. *Administrator, EPA,* Nos. C. 73–1061 & C. 74–104 (ND Ohio June 26, 1974); *Maine* v. *Fri,* Civ. No. 14–51 (Me. June 21, 1974); *Florida* v. *Train,* Civ. No. 73–156 (ND Fla. Feb. 25, 1974); *Texas* v. *Ruckelshaus,* No. A–73–CA–38 (WD Tex. Oct. 2, 1973); *Martin-Trigona* v. *Ruckelshaus,* No. 72–C–3044 (ND Ill. June 29, 1973); *Minnesota* v. *EPA,* No. 4–73, Civ. 133 (Minn. June 25, 1974). The only District Court case in which the issue was actively litigated and which held to the contrary was *Brown* v. *Ruckelshaus,* 364 F. Supp. 258 (CD Cal. 1973).