STATE WATER CONTROL BOARD, an
Agency of the Commonwealth of
Virginia, Plaintiff,

v.

Russell E. TRAIN, Administrator, United
States Environmental Protection
Agency, Defendant,

and

Newton H. Ancarrow,
Intervenor-Defendant.

Civ. A. No. 74-0328-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 6, 1976.

David E. Evans, James E. Ryan, Jr., Asst. Attys. Gen. of Virginia, Richmond, Va., for plaintiff.

Charles W. Shipley, Dept. of Justice, Washington, D. C., David S. Favre, Cornelius & Favre, Newport News, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This action is one brought by the State Water Control Board, an agency of the Commonwealth of Virginia, against Russell E. Train, Administrator of the United States Environmental Protection Agency in an attempt to obtain the relief for Virginia and certain of her political subdivisions from compliance with the July 1, 1977 deadline attainment of certain effluent limitations by publicly owned treatment plants imposed by the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500 § 101 *et seq.*, 86 Stat. 816, 33 U.S. C.A. §§ 1251, 1311(b)(1)(B). Intervenor Newton H. Ancarrow was granted leave to intervene as a defendant in this action in his capacity as a riparian landowner and citizen, vested with certain rights under the Act. Plaintiff seeks declaratory and injunctive relief. Jurisdiction is attained pursuant to 28 U.S.C. §§ 1331, 1361. The matter comes before the Court on motions by the respective parties for summary judgment.

Plaintiff contends that publicly-owned treatment plants need not comply with otherwise applicable effluent discharge limitations imposed by statute until such time as federal grant funds are available in an amount sufficient to underwrite seventy-five percent (75%) of the eligible cost of construction of such plants and a reasonable time has been afforded to complete the necessary construction. Plaintiff's contention is premised on the belief that the discharge limitation provisions of the Act are inextricably linked to the funding provisions. Defendant and Intervenor deny that any such link exists and maintain that the effluent limitations and deadlines are to be strictly adhered to. As the controversy centers on the construction of the Federal Water Pollution Control Act Amendments of 1972,[1] a brief look at the Act as it applies to the instant case is required.[2]

The primary objective of the Act "is to restore·and maintain the chemical, physical, and biological integrity of the Nation's water." 33 U.S.C.A. § 1251(a). This objective is to be partially realized through the maintenance of water quality standards. More important however, is the mechanism by which the discharge of effluents into the Nation's waterways is to be regulated. The Act renders unlawful any discharge of pollutants unless authorized by a special permit. 33 U.S.C.A. § 1311(a). Such permits may be issued by the EPA or by the state officials pursuant to a federally approved permit program. 33 U.S.C.A. § 1342(b)–(f). The statute calls for a two phase program for application of effluent limitations. In Phase I, publicly-owned treatment works must provide, by July 1, 1977, secondary treatment[3] (33 U.S.C.A. § 1311(b)(1)(B)) or

1. Plaintiff originally sought the release of certain funds impounded pursuant to executive order. This issue, however, was resolved by the Supreme Court in *Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). Since plaintiff is not challenging any substantive ·regulatory limitations on effluent discharges, plaintiff properly initiated this action in the District Court rather than the Court of Appeals. Cf. *duPont v. Train*, 528 F.2d 1136 (4th Cir. 1975).

2. For a good summary of the statute see Zener, The Federal Law of Water Pollution Control, in Federal Environmental Law, 683 (E. Dolgin and T. Guilbert, eds. 1974); Davis and Glasser, The Discharge Permit Program Under the Federal Water Pollution Control Act of 1972—Improvement of Water Quality Through the Regulation of Discharges from Industrial Facilities, 2 Fordham Urban L.J. 179 (1974).

3. Secondary treatment is defined by the EPA in 40 C.F.R. § 135.102 (1975) as follows:

higher levels of treatment required to implement water quality standards (33 U.S.C.A. § 1311(b)(1)(C)), whichever is more stringent. The failure to provide secondary treatment to effluent discharge within the statutorily imposed period renders that publicly-owned treatment plant ineligible for a discharge permit, and hence in violation of the law. Phase II increases the standard of regulation by requiring public plants to utilize the best practicable waste treatment technology in order to qualify for a discharge permit. 33 U.S.C.A. § 1311(b)(2)(B). The duty of enforcement of these limitations and deadlines is imposed upon the EPA and the right to require such enforcement is granted to private citizens. 33 U.S.C.A. §§ 1319, 1365. In addition to injunctive sanctions, a violator faces potential criminal and civil penalties.[4] Attorneys'

The following paragraphs describe the minimum level of effluent quality attainable by secondary treatment in terms of the parameters biochemical oxygen demand, suspended solids, fecal coliform bacteria and pH. All requirements for each parameter shall be achieved except as provided for in § 133.103.

(a) *Biochemical oxygen demand (five day).* (1) The arithmetic mean of the values for effluent samples collected in a period of 30 consecutive days shall not exceed 30 milligrams per liter.

(2) The arithmetic mean of the values for effluent samples collected in a period of seven consecutive days shall not exceed 45 milligrams per liter.

(3) The arithmetic mean of the values for effluent samples collected in a period of 30 *consecutive days shall not exceed* 15 percent of the arithmetic mean of the values for influent samples collected at approximately the same times during the same period (85 percent removal).

(b) *Suspended solids.* (1) The arithmetic mean of the values for effluent samples collected in a period of 30 consecutive days shall not exceed 30 milligrams per liter.

(2) The arithmetic mean of the values for effluent samples collected in a period of seven consecutive days shall not exceed 45 milligrams per liter.

(3) The arithmetic mean of the values for effluent samples collected in a period of 30 consecutive days shall not exceed 15 percent of the arithmetic mean of the values for influent samples collected at approximately the same times during the same period (85 percent removal).

(c) *Fecal coliform bacteria.* (1) The geometric mean of the value for effluent samples collected in a period of 30 consecutive days shall not exceed 200 per 100 milliliters.

(2) The geometric mean of the values for effluent samples collected in a period of seven consecutive days shall not exceed 400 per 100 milliliters.

(d) *pH.* The effluent values for pH shall remain within the limits of 6.0 to 9.0.

4. 33 U.S.C.A. § 1319 provides in pertinent part:

(b) The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. Any action under this subsection may be brought in the district court of the United States ‘for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given immediately to the appropriate State.

(c)(1) Any person who willfully or negligently violates section 1311, 1312, 1316, 1317, or 1318 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. If the conviction is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both.

(2) Any person who knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this chapter, shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both.

(3) For the purposes of this subsection, the term "person" shall mean, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer.

(d) Any person who violates section 1311, 1312, 1316, 1317, or 1318 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State, and any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty not to exceed $10,000 per day of such violation.

fees and costs may be awarded to private litigants for their aid in enforcing the Act. 33 U.S.C.A. § 1365(b).

The federal government through the Administrator of the EPA is to assist municipalities in undertaking to comply with the demands of the Act by providing grants to help finance the construction of treatment facilities. 33 U.S.C.A. § 1281(g)(1). The amount of such grants "shall be seventy-five percentum of the cost of construction" of the project. 33 U.S.C.A. § 1282(a). Congress authorized $18 billion for such grants for fiscal years 1973, 1974 and 1975. 33 U.S.C.A. § 1287. Each state's share of money is based on its needs. 33 U.S.C.A. § 1285. The approval of the Administrator of plants, specifications and cost estimates for a treatment works project contractually obligates the United States to pay its proportional contribution to any such project. 33 U.S.C.A. §§ 1282(a), 1283(a). Succinctly stated, the Act provides for a set of technology-based effluent discharged standards to be met within specific time periods. Federal funds are available to assist local governments in complying with these standards. Incentive to comply with the Act is provided by the sizable fine facing violators and the enforcement potential of the EPA and private citizens.

Plaintiff has set forth convincing evidence that many publicly-owned treatment plants are unable to meet the Phase I deadline of July 1, 1977 established by § 301(b)(1)(B) of the Act. Several factors contribute to this problem. First, there is a significant delay of thirty to forty-five months between the approval of a grant, and completion of a sewage treatment plant. Indeed, EPA officials have estimated the lag time is as much as five years. The lag time is due, in part, to the administrative process of approving the plans submitted by municipalities. See 40 C.F.R. §§ 35.917, 35.920–35, 35.925–19 (1975). Ad-

ministrative approval of a grant request is estimated to require six months to one year. Construction is unlikely to commence prior to this approval as the funds are not committed until after final EPA approval of the grant application. The actual construction of the project accounts for the remainder of the lag time. The generally recognized shortage of monetary resources also contributes to municipal difficulty in meeting § 301(b)(1)(B) deadlines. Upon congressional enactment of this legislation overriding a Presidential veto, and pursuant to a Presidential directive, the Administrator refused to allocate approximately 55% of the funds intended to be used to finance Virginia projects. The impounded funds have been subsequently released. See *Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). The disruption that the impoundment imposed on the flow dollars plus the lead time required to construct treatment plants, virtually guarantees that many municipalities will not have secondary treatment facilities operational by the July 1, 1977 deadline despite their having received federal grants.

Plaintiff also contends that there simply were not enough funds appropriated under the Act to provide 75% grants to all municipalities in need of assistance. State studies estimate that $1.417 billion are required to construct the facilities needed in Virginia to comply with § 301(b)(1)(B). The federal share of this amount would be $1.063 billion. The EPA figures are quite comparable. They estimate $1.345 billion represents the total unfunded needs for Virginia, the federal share of which would be $1.008 billion. United States Environmental Protection Agency, Cost of Construction of Publicly-Owned Treatment Works: 1973 'Needs' Survey (November 1973). These figures sharply contrast with Congress' assessment of the needs of Virginia for a two year period ($424.4 million). See Table III of the

---

(e) Whenever a municipality is a party to a civil action brought by the United States under this section, the State in which such municipality is located shall be joined as a party. Such State shall be liable for payment of any judgment, or any expenses incurred as a result of complying with any judgment, entered against the municipality in such action to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment.

House Com. on Public Works, Print No. 90–50, 1972 U.S.Code Cong. & Admin.News p. 3791 (1972). The funds that are available moreover, must be allotted in 75% grants. 33 U.S.C.A. § 1282. Without sufficient money to adequately fund every required project, it is certain that some municipalities will not receive any federal funding.

These factual allegations and conclusions are largely uncontested by defendants. Indeed, the EPA concedes that "50% or 9,000 municipalities serving 60% of the 1977 population will not be able to comply" with § 301(b)(1)(B). 40 Fed.Reg. 23111 (May 28, 1975). In addition to the lag time and inadequate funding problems heretofore identified, the EPA points out that the actual cash flow of moneys already appropriated has been slower than anticipated. Thus, the EPA admits that "even some of the projects initiated about the time of, or shortly after the passage of [the Act] cannot be completed within the § 301 time period." 40 Fed.Reg. 23111 (May 28, 1975).

In short, many municipalities within the Commonwealth of Virginia are virtually unable to comply with § 301 of the Act. These municipalities include those which have received federal aid as well as those which have not. Many local governments therefore face potentially serious sanctions for violating a statute which under the existing circumstances they cannot possibly comply with. In order to avoid this result, plaintiff requests the Court to enter a declaratory judgment as follows:

"It is declared that, for each publicly-owned sewage treatment plant that cannot be put into compliance with the July 1, 1977, deadline under § 301(b)(1)(B) of the Act, such plant shall not be required to comply with the applicable limitations under § 301(b)(1)(B) of the Act until such time as federal grant funds are available in an amount sufficient to underwrite 75% of the eligible cost of construction thereof and a reasonable time has been allowed to complete the necessary construction."

Plaintiff's entitlement to such a declaration bottoms on an interpretation of the Act that links the duty to comply to the availability of federal assistance grants. Plaintiff asserts that the structure of the Act, its legislative history and the policy behind it exhibit a Congressional intent to provide for such a linkage.

 In interpreting statutes, it is axiomatic that the Court must first look to the "words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation." *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). *Accord, Portland Cement Ass'n v. Ruckelshaus*, 158 U.S. App.D.C. 308, 486 F.2d 375, 379 (1973). The language of the Act concerning effluent limitations and deadlines for compliance is categorical on its face. That section provides:

(a) Except as in compliance with this section and §§ 1312, 1316, 1317, 1328, 1342 and 1344 of this title, the discharge of any pollutant by any person *shall* be unlawful. (Emphasis added).

(b) In order to carry out the objective of this chapter there *shall* be achieved— (Emphasis added)

(1)(B) For publicly owned treatment works in existence on July 1, 1977, or approved pursuant to § 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to § 1314(d)(1) of this title;

As is obvious, Congress chose language of mandatory nature in establishing the duties of municipalities. Both the Senate and House reports on the legislation underscore the Congressional intent that the limitations and deadlines are to be strictly adhered to.[5] The policy of the Act is perhaps captured most emphatically by the state-

---

5. The Senate Report described the limitations and deadlines as follows:

This section clearly establishes that the discharge of pollutants is unlawful. Unlike its

ment of Senator Montoya, who in describing the Committee's intentions said:

"Your committee has placed before you a tough bill. This body and this Nation would not have it otherwise. Our legislation contains an important principle of psychology: Men seldom draw their best from themselves unless pressed by circumstances and deadlines. This bill contains deadlines and it imposes rather tough standards on industry and municipalities, and all other sources of pollution. Only under such conditions are we likely to press the technological threshold of innovation into new and imaginative developments that will allow us to meet the objectives stated in our bill." (Remarks of Senator Montoya as shown by the Congressional Record) [6]

■ The funding provisions are equally clear on their face. For a three year period, Congress obligated a total of $18 billion to cover 75% of the cost of constructing needed public waste treatment plants.[7] The money is to be allotted to the states on the basis of their need as determined by the EPA.[8] Two sections of the Act provide for its enforcement. The Administrator acts

predecessor program which permitted the discharge of certain amounts of pollutants under the conditions described above, this legislation would clearly establish that no one has the right to pollute—that pollution continues because of technological limits, not because of any inherent right to use the nation's waterways for the purpose of disposing of wastes. . . .

The deadlines established to achieve effluent limitations are strict. Time will be required to achieve any effluent limitations established. Sources of pollution, whether they are cities or industries, must know what the requirements are in order to proceed on schedule with their construction program. In the case of cities, this should not be difficult, because of the existing requirement that a minimum of secondary treatment is maintained for Phase I. Many communities have begun to construct these needed facilities. Others are in the process. Of course others must act quickly to begin construction if they are to meet the deadlines required in the legislation.
S.Rep.No.92–414, 92d Cong., 2d Sess., (1971), 1972 U.S.Code Cong. & Admin.News, pp. 3709–3711 (1972). The House Report stated that "[I]t is the intention of the Committee that the requirements of section 301(b)(1)(A) and (B) be met by phased compliance between the date of enactment of this Act and January 1, 1976, so that all point sources will be in full compliance by no later than January 1, 1981 except as any extension of time for compliance may be made in accordance with section 301(b)(3)." H.R. Rep.No.92–911, 92d Cong., 2d Sess. (1971).

6. The Act, Presidential veto message, excerpts from the Conference, House and Senate Debates, excerpts from the Conference, House and Senate Reports and Administration testimony can be found in a two volume work. Senate Comm. on Public Works, *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 93d Cong., 1st Sess. (January 1973) (Comm. Print). [hereinafter cited as *Legislative History*].

7. 33 U.S.C.A. § 1287 provides:
There is authorized to be appropriated to carry out this subchapter, other than section 1286(e), 1288 and 1289 of this title, for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,000,-000, and for the fiscal year ending June 30, 1975, not to exceed $7,000,000,000.
33 U.S.C.A. § 1282(a) provides:
(a) The amount of any grant for treatment works made under this chapter from funds authorized for any fiscal year beginning after June 30, 1971, shall be 75 per centum of the cost of construction thereof (as approved by the Administrator). Any grant (other than for reimbursement) made prior to October 18, 1972, from any funds authorized for any fiscal year beginning after June 30, 1971, shall upon the request of the applicant, be increased to the applicable percentage under this section.

8. 33 U.S.C.A. § 1285(a) provides:
(a) Sums authorized to be appropriated pursuant to section 1287 of this title for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after October 18, 1972. Such sums shall be allotted among the States by the Administrator in accordance with regulations promulgated by him, in the ratio that the estimated cost of constructing all needed publicly owned treatment works in each State bears to the estimated cost of construction of all needed publicly owned treatment works in all of the States. For the fiscal years ending June 30, 1973, and June 30, 1974, such ratio shall be determined on the basis of table III of House Public Works Committee Print No. 92–50. For the fiscal year ending June 30, 1975, such ratio shall be

pursuant to § 309 which provides in pertinent part:

"(a)(3) Whenever on the basis of any information available to him the Administrator finds that any person is in violation of § 301, 302, 306, 307, or 308 of this Act, or is in violation of any permit condition or limitation implementing any of such sections in a permit issued under § 402 of this Act by him or by a State, he shall issue an order requiring such person to comply with such section or requirement, or he shall bring civil action in accordance with subsection (b) of this section." 33 U.S.C. § 1319(a)(3).

Citizens may assist in enforcing the Act pursuant to § 505 which provides in pertinent part:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act [33 U.S.C.A. §§ 1251–1376] or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act [33 U.S.C.A. §§ 1251–1376] which is not discretionary with the Administrator.

(f) For purposes of this section, the term "effluent standard or limitation under this Act" [33 U.S.C.A. §§ 1251–1376] means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 301 of this Act;

33 U.S.C.A. § 1365(a)(1)(2), (f)(1).

Neither of these sections in any way conditions the enforcement power of the Administrator or citizen upon federal funding. Application of the 'plain meaning' rule of statutory interpretation, then, would dispose of this action in a fashion contra to plaintiff's contention. *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945); *Ex parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Plaintiff contends, nonetheless, that this 'plain meaning' interpretation would lead to an 'absurd' result, and hence, the Court must embark on the perilous task of searching beyond the words, and reaching a conclusion as to the purpose of the Act. Cf. *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Quinn v. Butz*, 166 U.S.App. D.C. 363, 510 F.2d 743 (1975). The result threatened in this instance is the holding of municipalities liable for violating a statute that under the existing circumstances they cannot conceivably comply with. Such a result, so plaintiff contends, would be inconsistent with the thrust of the Act when viewed in its entirety.

Plaintiff's position is that in formulating its policy and program, that Congress employed the following methodology:

(1) the goals to be achieved were specified;

(2) the deadlines for achievement of these goals were established;

(3) the total cost, and the federal share thereof, of needed publicly-owned waste treatment facilities was determined and these facilities were required to meet the specified goals by the established deadlines; and

determined one-half on the basis of table I of House Public Works Committee Print Numbered 93–28 and one-half on the basis of table II of such print, except that no State shall receive an allotment less than that which it received for the fiscal year ending June 30, 1972, as set forth in table III of such print. Allotments for fiscal years which be-

gin after the fiscal year ending June 30, 1975, shall be made only in accordance with a revised cost estimate made and submitted to Congress in accordance with section 1375(b) of this title and only after such revised cost estimate shall have been approved by law specifically enacted after October 18, 1972.

(4) corresponding authorizations of funds to underwrite the federal share of those costs were provided.

This theory postulates that since Congress believed that $18 billion would cover the anticipated federal share of the cost of compliance and that Congress did not desire to overburden the limited financial resources of municipal governments, that Congress must have intended to condition the duty to comply upon the availability of the federal share of funds.

There is, of course, support for each premise of the above stated syllogism. Congressman Jones during the floor debate on the House version of the bill noted the care with which the $18 billion figure was arrived at. "These calculations are made for a program extending into 1975, and were arrived at after a long and very careful and conservative study of all the data, all the cost estimates submitted to the Committee by federal, state, and local governmental authorities, by individual experts, and the highest opinions by environmentalists of long experience and other persons who have proven their economic expertise." See *Legislative History*, supra n.6, 265–266. Congressman Grove similarly described the amount of funding contemplated as "appropriate in view of the magnitude of the program we are tackling . . . .. The authorization provided in H.R. 11896 is one carefully calculated to meet the needs of the problems we face . . . .. The $18 billion provided in this bill is a realistic figure of the funding that will be needed to get the job done." *Legislative History*, 365–67. Similar sentiments were voiced by Senator Muskie, the chief sponsor of the legislation, in endeavoring to persuade the Senate to override a Presidential veto.[9] In support of its thesis, plaintiff cites specific provisions of the Act. Section 205 creates a mechanism by which authorized but unused funds may be 'reallotted' so as to insure complete utilization of the entire $18 billion figure.[10] Section 206 authorizes the reimbursement of publicly-owned treatment works for certain funds expended prior to the passage of the Act. See 33 U.S.C.A. § 1286. The failure to include a similar reimbursement provision in the Act coupled with the above cited two sections, so it is argued, exhibits a Congressional understanding that the $18 billion authorized would be sufficient to cover the federal share of construction cost mandated by § 301(b)(1)(B).

**9.** Senator Muskie stated:

"Mr. President, the language I have read from the President's veto message states quite plainly that he believes this bill represents overspending. May I say to the Senate that *the amount authorized in the legislation by the committees is based on a very careful evaluation of needs, including estimates submitted by the administration itself.*

\* \* \* \* \* \*

The conferees decided that $18 billion was the required level of funding for Federal grants. None of us were pleased that the price tag is that high, but none of us are prepared—as the President is—to back off from the challenge by claiming we cannot afford to pay that price."

—— Cong.Rec. —— (Statement of Senator Muskie), *Legislative History, supra,* n.6, 115–122.

**10.** 33 U.S.C.A. § 1285(b) provides:

"(b)(1) Any sums allotted to a State under subsection (a) of this section shall be available for obligation under section 1283 of this title on and after the date of such allotment. Such sums shall continue available for obli-gation in such State for a period of one year after the close of the fiscal year for which such sums are authorized. Any amounts so allotted which are not obligated by the end of such one-year period shall be immediately reallotted by the Administrator, in accordance with regulations promulgated by him, generally on the basis of the ratio used in making the last allotment of sums under this section. Such reallotted sums shall be added to the last allotments made to the States. Any sum made available to a State by reallotment under this subsection shall be in addition to any funds otherwise allotted to such State for grants under this subchapter during any fiscal year.

(2) Any sums which have been obligated under section 1283 of this title and which are released by the payment of the final voucher for the project shall be immediately credited to the State to which such sums were last allotted. Such released sums shall be added to the amounts last allotted to such State and shall be immediately available for obligation in the same manner and to the same extent as such last allotment."

The legislative history discloses as well additional expressions of Congressional desire not to burden local governments without a guarantee that the federal share of funds would be available. Congressman Wright defended contractual funding as a means to provide "good faith assurance . . . that we will not leave them out on a limb only to saw it off behind them for want of available funds." *Legislative History* 628. The Chairman of the Senate Committee on Public Works, Senator Randolph, likewise stated that "[t]he Committee does not want to impose impossible goals, nor does it intend to require expenditures so excessive that they would undermine our economy." *Legislative History* 1272.

Admittedly, the aforecited legislative history does support plaintiff's two premises that Congress believed that $18 billion would sufficiently cover the federal share of all necessary public construction and that Congress did not intend to place unreasonable financial burdens on local governments. Nevertheless, acceptance of these premises does not compel the conclusion plaintiff advances. In this regard, plaintiff's argument merely reflects, at most, congressional oversight. It does not clearly establish that the congressional solution to this dilemma would be conditioning compliance upon obtaining federal grants.

As sympathetic as the Court may be, it is precluded in the exercise of its responsibility to grant plaintiff its requested relief for several reasons. First, the legislative history of the Act contains ample evidence that Congress was indeed aware of the very factors cited by plaintiff as contributing to the instant difficulty of municipal compliance with § 301(b)(1)(B). Unquestionably, Congress was cognizant of the then recognizable inflationary cycle and the time required to plan and construct waste treatment plants. William Ruckelshaus, then Administrator of the EPA, straightforwardly informed Congress that "[t]he time tables imposed in S. 2770 and H.R. 1196 [11896] are unlikely to be met in terms of physical construction of facilities. It may be quite possible to commit funds, perhaps even to initiate construction, but to complete the needed work will almost certainly be impossible." Hearings on H.R. 11896 Before the Committee on Public Works, House of Representatives, 92nd Cong., 2d Sess. (December 7, 1971). *Legislative History* 1208. Mr. Ruckelshaus went on to document the existence of a five year lag time between the issuance of grants and completion of projects, and that the backlog of works under construction increases geometrically to the increase in projects initiated. *Id.* Further evidence was submitted to support the EPA's contention that the waste water construction industry could not expand at a rate required to accommodate the increased demand sparked by the standards and deadlines contained in the Act. Hearings on H.R. 11896 before the Committee on Public Works, House of Representatives, 92nd Cong., 2d Sess. (December 7, 1971), *Legislative History* 1209–1213. Moreover, his testimony elaborated as to how the general rate of inflation in the industry would increase sharply due to the tremendous increase in demand on the limited available resources. Despite these predictions Congress chose to adopt the specific standards and deadlines contained in § 301(b)(1)(B).

It would appear also that a number of congressmen were aware that the $18 billion obligation might well be insufficient to cover the 75% of the federal share of all required construction. The National League of Cities—United States Conference of Mayors informed Congress that between $33–37 billion was needed to finance the backlog of the then existing water treatment construction projects. In its report on S. 2770, the Senate Committee on Public Works noted in reference to this estimate that "[w]hile the funds authorized by this Act will not provide full Federal assistance to retire a backlog of that magnitude there should be adequate funds for communities to make major inroads into their construction backlog and begin to achieve the kind of program anticipated by this legislation." S.Rep.No.92–414, 92d

Cong., 2d Sess. (1971), 1972 U.S.Code Cong. & Admin.News p. 3701 (1972).[11] Moreover, individual congressmen expressed doubts as to whether their states' share of the $18 billion would meet the anticipated needs. Senator Bayh, a member of the Conference Committee noted that "[u]nder the provisions of the bill, the allotments for my own State of Indiana for fiscal years 1974 and 1975 will amount to approximately $370 million—*not enough to meet every need in my state, to be sure, but enough to make a very significant contribution to solving the problems we have.*" *Legislative History* 2161 (Emphasis added). Congressman Fraser of Minnesota was even more specific in his statement "Minnesota's plans for construction of 140 sewage treatment plants will require $212 million in the coming year. Seventy-five percent of this—the maximum—federal share—would come to $159 million. Under the vetoed bill, Minnesota would be eligible for only $100 million." *Legislative History* 100. Senator Mathias referred to the funding as "only a down payment for the entire job." *Legislative History* 1406. Indeed, Senator Muskie described the $18 billion sum as necessary "*to begin* to achieve the requirements set forth in the legislation" and as a "*minimum* dose of medicine." Legislative History 164–65. (Emphasis added). In short, there is ample evidence that Congress had notice that the funds authorized would be insufficient to complete the assigned tasks.

Plaintiff's position is further weakened by the fact that EPA officials attempted to insert into the legislation an express provision virtually identical to the concept plaintiff would have this Court deem to be Congressional intent. Defendant Train in testifying before the House Committee on Public Works, stated that "[S]ome provision should be made, however, for an extension of the deadlines for facilities where it cannot be achieved despite the best good faith efforts." Hearings on H.R. 11896 before the Committee on Public Works, House of Representatives, 92nd Cong., 2d Sess. (December 7, 1971), *Legislative History* 1115. Mr. Ruckelshaus detailed the type of flexibility needed. He was convinced that "A two year extension from the 1976 deadline will be necessary for some industrial sources. *Similarly, we are of the view that all municipal sources in existence in 1976 cannot achieve secondary treatment; that secondary treatment requirements should only apply to projects for which federal grants are provided.*" Letter from William D. Ruckelshaus, Administrator, EPA, to John A. Blakink, Chairman, House of Public Works Committee dated December 13, 1971, *Legislative History* 1197 (Emphasis added). Thus it appears that Congress was urged to write the statute as plaintiff would now have the Court construe it, yet despite such urgings Congress saw fit not to so do.

In the Court's view, the most important factor weighing against plaintiff's proposed interpretation is the total absence of any language in the statute in support of its position. As heretofore noted, the standards and guidelines are strict and were intended to so be.

In light of Congress having been forewarned, and thereafter refusing to establish any exceptions to the compliance provisions, the Court, in its view, is precluded from enunciating any such exception in the context of the instant proceedings. To so do, as tempting as the suggestion is, would be dereliction of its conceived responsibility. Enforcement flexibility, as now urged upon the Court, was, and is, within the power of a branch of government other than the judicial. The statute does in fact provide temporary relief for non-public treatment

---

11. The original Senate version of the Act did not require public treatment works to construct sewage collection systems and provided $14 billion for construction. Sewage collection systems were made part of the enacted legislation and the authorization increased to $18 billion.
 Congress was well aware of the estimate of the National League of Cities—United States Conference of Mayors and it is frequently cited in the history of the Act. See, e. g., —— Cong. Rec. —— ( ) (Senate Debate on the Veto Override), *Legislative History, supra,* n.6, 121; —— Cong.Rec. —— ( ) (remarks of Senator Muskie), *Legislative History, supra,* n. 6, 1369.

works unable to economically comply with Phase II of the deadlines.[12] Pointedly, no similar provision was made for public treatment works unable to comply with Phase I, with which the instant plaintiff is here concerned. In the context of the war against air pollution, Congress found no difficulty in establishing procedures whereby deadlines for compliance with air quality standards could be postponed. 42 U.S.C. § 1857c–5(f). See *Train v. Natural Resources Defense Council,* 421 U.S. 60, 78–85, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

■ It must be borne in mind that the issue as to whether predicating a duty to comply with statutory standards upon availability of federal funds is a sound policy is not for the Court to determine. Indeed, the EPA has shown past and present indications of favoring plaintiff's basic policy position. *See* EPA Memorandum Detailing Policy for Case-by-Case Extension of 1977 Secondary Treatment Requirements of Certain Publicly-Owned Treatment Works. December 3, 1975, 6 BNA Environ. Rep. Current Dev. 1372–73 (December 5, 1975) *disclaimed,* 6 BNA Environ. Rep. Current Dev. 1380 (December 12, 1975); Letter from John Quarles to W. W. Adams, Chairman, California State Water Resources Control Board, June 6, 1973 cited in Robie, State Viewpoint: (The Federal Water Pollution Control Act and the States: Love in Bloom or Marriage on the Rocks), 7 Nat. Resources L. 231, 236 (1974). Obviously, any number of alternative policies are available for congressional consideration. We deal here however not with possible alternatives; for such are matters appropriately left to a legislative body. One alternative would be to ease the required deadlines, but such is not within this Court's power. The Court's responsibility is to interpret the statute so as to effectuate the intent of Congress. In the instant case, plaintiff has not established that Congress intended to condition compliance upon federal funding. The statute simply does not say that which the plaintiff urges. The legislative history, unfortunately, is not particularly illuminating on this precise issue. Indeed, it may be that Congress did intend that insufficiency of federal funds would relieve a municipality from the need to comply with otherwise strict standards, "[B]ut legislative intention, without more, is not legislation." *Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975).

While the Court must deny plaintiff's requested relief, such denial is predicated on the precise issues before it, and is not to be construed as an adjudication of measures it would take in the determination of any suit against a municipality for alleged violations of § 301(b)(1)(B), where an impossibility of compliance, despite a good faith effort, is established. Such an adjudication, as all judicial adjudications, must await appropriate litigation.[13]

An appropriate order will issue.

---

**12.** 33 U.S.C.A. § 1311(c) provides: .

(c) The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

**13.** Plaintiff vigorously contends that failure to grant the requested relief will lead to the absurd result of holding local governments liable for violating a standard they cannot possibly meet. Should this result in fact come about, the fault, if any, lies with Congress. It should be noted that an industrial polluter was held liable for failing to obtain a discharge permit under § 13 of the Rivers and Harbors Act at a time when there existed no structure by which such a permit could be obtained. *United States v. Pennsylvania Industrial Chemical Corp.,* 411 U.S. 655, 668–69, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). In such a situation, a polluter must either cease discharging effluents or face the penalties. See *Natural Resources Defense Council v. Train,* 396 F.Supp. 1393 (D.D.C. 1975). The permit program utilized in the Federal Water Pollution Control Act Amendments of 1972, moreover, is modeled, in part, on § 13 of the Rivers and Harbors Act. See S.Rep.No. 92–414, 92d Cong., 2d Sess. (1971), 1972 U.S. Code Cong. & Admin.News p. 3709 (1972).